PER CURIAM.
 

 This case is before the Court on appeal from a judgment of conviction for first-degree murder and a sentence of death, as well as a conviction for kidnapping. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons set forth in this opinion, we affirm the convictions and sentence of death.
 

 FACTS
 

 Ray Jackson and his codefendant, Michael Wooten, were indicted and tried together for the kidnapping and first-degree murder of Pallis Paulk. The victim was murdered after she was kidnapped in retribution for having stolen drugs and money from Jackson. Both Jackson and his codefendant were convicted of kidnapping and first-degree murder.
 

 Guilt Phase Evidence
 

 When Pallis Paulk was last seen alive by an acquaintance on November 9, 2004, she was being forced into the trunk of a car by Jackson. Her body was found in a shallow grave several months later. The facts at trial concerning her murder came in through a series of witnesses by which the following factual scenario was presented.
 
 [1]
 

 Around 3 a.m. on the morning of November 9th, Paulk arrived at a friend’s house, looking for ecstasy pills. Her friend, Curtis Vreen, testified that Paulk arrived in a red hatchback.
 
 [2]
 
 He noticed that there was someone else in the car, but he could not see the person’s face. Vreen gave her half of an ecstasy pill and told her that was all he had.
 

 Later that day, Paulk called her sixteen-year-old cousin, Calvin Morris, and told Morris, “I have a lick for you, Cuz,” which meant that she found a person to rob. Morris met Paulk at an apartment in Day-tona Beach, and when Morris arrived, he saw Ray Jackson sleeping in bed. Concerned that Jackson might wake up, Morris walked back to the car and waited for his cousin. Paulk arrived at the car, carrying a Sponge Bob bag, which contained about two ounces of cocaine, some marijuana, and approximately $800. She also had men’s jewelry and a cell phone that did not belong to her. Together, they drove to pick up Morris’s girlfriend in Sanford, Florida, and smoked some of the marijuana. While they were driving, Paulk called Vreen, looking for more ecstasy.
 

 
 *523
 
 At some point after Paulk left Jackson’s apartment, Jackson woke up and realized the theft. Jackson and codefendant Wooten went to Latisha Allen’s apartment and asked to speak to Frederick Hunt, who was Vreen’s cousin.
 
 [3]
 
 Based on Jackson’s request, Hunt called Vreen to see if he had heard from Paulk. Vreen responded that Paulk had called him and provided the phone number from which Paulk had called Vreen. After Hunt relayed this information to Jackson, Jackson left.
 

 Later in the day, Morris took Paulk to Vreen’s house, even though Morris was afraid that Jackson would be there looking for Paulk. Paulk went inside, telling Morris that she would be right back. While Morris was waiting in the car, Wooten came outside and told Morris that Paulk was using the restroom. Jackson and Paulk eventually came out of the house and walked up to Morris’s car. Morris saw that Jackson had a gun. Jackson asked, “Where is my stuff at?” Morris immediately gave Jackson his marijuana back. Paulk retrieved some additional items from Morris’s car and then left with Jackson.
 

 Morris noticed that Paulk looked upset, like she wanted to cry. According to Morris, Jackson shoved Paulk into the back of a red hatchback, and Jackson, Wooten, and Paulk drove away. Morris initially followed them, but stopped after Jackson held a gun out of the window. Morris immediately went to his grandmother’s house and told her what had happened, but did not go to the police at that time because he had outstanding warrants against him.
 

 Jackson took Paulk to Allen’s apartment. Although Hunt, Thomas, and Allen were not there when he first arrived, Jackson had keys to Allen’s apartment;
 
 [4]
 
 Allen and Hunt returned to Allen’s apartment and saw a red hatchback parked in front. Jackson was inside, sitting by the hallway that led to the bedrooms. Jackson told Allen that he had been robbed and asked her to go look. Allen went into the bathroom where she saw a woman in her bathtub, dressed but with her hands tied behind her back. The woman told Allen that she was fine and that it was her fault. After Allen left the bathroom, Wooten told her not to be “dumb” like the victim or she could end up the same way. Allen asked if Jackson was going to kill the woman, and he nodded yes.
 
 [5]
 
 Allen left to bail her boyfriend out of jail, but Hunt remained.
 

 Although a number of people were in Allen’s apartment, Wooten and Jackson were the only people who entered the bathroom after Allen left. Jackson asked if anybody wanted to “have fun” with Paulk, but no one responded. Jackson obtained duct tape and, after putting on some gloves, went into the bathroom with the duct tape.
 

 Once night fell, Jackson had several people serve as lookouts. Jackson then retrieved Paulk and carried her over his
 
 *524
 
 shoulder to one of his cars, a blue Oldsmobile Delta 88. As they neared the car, Paulk pleaded with Jackson not to put her in the trunk. Despite her pleas, Jackson forced Paulk into the trunk. Paulk resisted, straightening her legs so the trunk lid would not close. Jackson punched her in the face, Hunt hit Paulk in the back of her legs, and they were finally able to close the trunk. After retrieving his keys, Jackson left. Paulk’s friends and family never saw her alive again.
 

 After Hunt helped in Paulk’s kidnapping, Hunt and Jackson became much closer. Hunt moved in with Jackson, selling drugs for Jackson, answering his phones, and running different errands for him. At some point, Hunt heard that a body had been found and told Jackson. Jackson called somebody and asked that person to go to the spot, but to “step lightly” and then call him back. On a different occasion, when Hunt had Jackson’s phone, a person from Paulk’s family called, accusing Jackson of doing something with Paulk. When Hunt informed Jackson about the call, Jackson replied that he was not “worried about it because they ain’t got no body, they ain’t got no case.”
 
 [6]
 
 After Paulk’s family posted flyers about Paulk in an attempt to find her, Jackson asked Hunt to find one of the flyers and tried to hang it up on his wall. Before Paulk’s body was found, Hunt and Jackson’s relationship soured after Jackson borrowed $800 from Hunt to buy cocaine and never repaid the money.
 

 On April 17, 2005, Paulk’s body was discovered in a shallow grave. There were no visible signs of injury, but her body was severely decomposed. Using dental comparisons, a forensic dentist affirmatively identified the body as Pallis Paulk. The medical examiner opined that the cause of death was homicidal violence of undetermined etiology. Although he was unable to determine the precise method of death, he ruled out a drug overdose after reviewing the toxicology report. Shortly after Paulk’s body was discovered, Hunt and Allen approached the police together, providing information regarding Paulk’s disappearance.
 

 At trial, in his defense, Jackson presented Captain Brian Skipper, an officer with the Daytona Beach Police Department, who testified about an alleged serial killer who murdered three women between December 26, 2005, and February 24, 2006. However, on cross-examination, the State demonstrated substantial differences between those crimes and the murder of Paulk.
 

 During codefendant Wooten’s defense, Wooten called Quentin Wallace, a fellow inmate who testified that while Hunt was in prison, Hunt talked to him about his own case and said that he had lied about both Wooten and Jackson and that Wooten was not even there. Wooten also testified, alleging that he lived in Jacksonville at the time of the crime and was at work on the day that the kidnapping occurred. He further denied owning a red hatchback at the time of the crime.
 

 Based on the above evidence, by special verdict forms, the jury found that Jackson was guilty of first-degree murder under the theories of premeditated murder and felony murder. The jury found that Wooten was guilty of only first-degree felony murder. The jury found that both Jackson and Wooten were guilty of kidnapping.
 

 Penalty Phase
 

 During the penalty phase, the State presented several victim impact statements and announced that Jackson had stipulated to the facts that he had prior convictions
 
 *525
 
 for robbery, battery on a law enforcement officer, and resisting arrest with violence.
 

 Jackson called numerous witnesses who testified about the poor conditions in which he grew up. According to these witnesses, both Jackson and his younger brother, Thayer, lived with their mother, who abused drugs and disappeared for weeks at a time. Jackson became a father figure and made sure that they had enough food to eat. After Jackson’s younger sister died, Jackson tried to hang himself. Both of the boys entered the foster care system. Thayer’s aunt raised Thayer, but was unable to take Jackson. Jackson went to a mental health facility, where he stayed for a considerable period of time. Jackson’s wife also testified, asserting that Jackson was a good worker, a good neighbor, a good provider, good to children, generous to others, and had two children who needed him.
 

 Finally, Dr. Jeffery Danziger, a psychiatrist, reviewed Jackson’s prior mental health history records, as well as other aspects of the case. Dr. Danziger opined that Jackson suffers from “bipolar disorder type II,” a mood disorder in which a person swings from depressive episodes to manic episodes. Dr. Danziger thought it was very unusual that Jackson attempted to hang himself at the age of eight and was in a mental hospital at Macclenny from the age of eight until he was almost ten.
 

 By a vote of nine to three, the jury recommended that Jackson be sentenced to death. After holding a Spencer
 
 [7]
 
 hearing, the court agreed with the jury’s recommendation and sentenced Jackson to death, concluding that the aggravators outweighed the mitigators. In making this determination, the court found three aggravating circumstances applied: (1) Jackson was previously convicted of a felony involving the use or threat of violence to a person based on Jackson’s prior convictions for robbery, battery on a law enforcement officer, and resisting arrest with violence; (2) the capital felony was committed while Jackson was engaged in the commission of a kidnapping; and (3) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The court did not find any statutory mitigation, but did find twelve nonstatutory mitigating factors.
 
 [8]
 
 The trial court specifically analyzed the relative culpability of codefendant Wooten, who received a life sentence, and found that the evidence indicated that the codefendant was an “underling of the defendant and
 
 *526
 
 was operating at the defendant’s direction.”
 

 ANALYSIS
 

 Jackson appeals his convictions and sentence of death, raising seven issues.
 
 [9]
 
 We address each claim in turn.
 

 Improper Impeachment
 

 In his first claim, Jackson alleges that the trial court erred in permitting the State to present improper impeachment of witness Quintín Wallace to the jury, which it also used during closing. Wallace was a fellow inmate who knew both codefendant Wooten and Hunt, a key State witness. Wallace testified on codefendant Wooten’s behalf that Hunt told him that he had lied about Wooten and Jackson being involved in the crime. Over defense objection, the trial court permitted the State to impeach Wallace based on the nature of his prior conviction, accepting the State’s argument that Wallace was biased against the State based on his conviction. We agree with Jackson that the State improperly impeached Wallace with evidence of the exact nature of his prior conviction but conclude that any error was harmless beyond a reasonable doubt.
 

 Pursuant to section 90.610, Florida Statutes (2007), a party can attack the credibility of a witness by introducing evidence that the witness has been convicted of a crime if the crime was punishable by death or imprisonment in excess of one year, or if the crime involved dishonesty or a false statement.
 
 See
 
 § 90.610, Fla. Stat. (2007). This inquiry is generally restricted to the existence of prior convictions and the number of convictions, unless the witness answers untruthfully.
 
 See Fotopoulos v. State,
 
 608 So.2d 784, 791 (Fla.1992).
 

 The State acknowledges the general prohibition against impeachment with the specific nature of convictions but argues to this Court, as it did to the trial court, that the nature of the conviction was necessary to establish bias. Under section 90.608(2), Florida Statutes (2007), any party may attack the credibility of a witness by showing that the witness is biased. Generally speaking, however, evidence of the specific nature of the conviction would not establish bias, and allowing inquiry as to the specific nature of the charge would circumvent the prohibitions of section 90.610. Further, evidence of bias is subject to the balancing test mandated by section 90.403, Florida Statutes (2007), which requires a court to hold otherwise admissible evidence inadmissible if its unfair prejudice to a party substantially outweighs its probative value.
 
 Coolen v. State,
 
 696 So.2d 738, 743 (Fla.1997).
 

 The proper scope of cross-examination into this witness’s bias included his belief that he had been wrongfully convicted based on the testimony of an informant; that he had been prosecuted by the same state attorney’s office prosecuting Wooten; and that he was “walloped” with a twenty-five-year sentence. The fact that his con
 
 *527
 
 viction was for aggravated manslaughter of a child did not establish bias in this case, and any probative value would be outweighed by the danger of unfair prejudice, particularly in light of the fact that the nature of the conviction was exploited by the State by referring to Wallace as a “convicted child killer.”
 

 Although we have considered that admission of this evidence and its use by the prosecutor created a risk of unfair prejudice, we have also concluded that under the circumstances of this case the error was harmless beyond a reasonable doubt.
 
 See State v. DiGuilio,
 
 491 So.2d 1129 (Fla.1986). Under
 
 DiGuilio,
 
 the State, which was the beneficiary of the error, must prove that “there is no reasonable possibility that the error contributed to the conviction.”
 
 Id.
 
 at 1135. In carrying out this review, the Court must examine the entire record, “including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.”
 
 Id.
 

 In reviewing the record, including both the permissible and impermissible evidence that might have influenced the jury, we hold that there is no reasonable possibility that the error contributed to Jackson’s conviction for murder. First, the impermissible cross-examination on the specifics of Wallace’s prior conviction did not involve a testifying defendant or even a witness to the crime. Instead the cross-examination involved a witness who testified on behalf of Wooten for the purposes of impeaching Hunt, one of the many witnesses who established Jackson’s guilt. Second, Wallace’s testimony itself was significantly impeached in the following respects: (1) Wallace had a close friendship with Wooten and was happy to assist his friend; (2) Wallace felt he was wrongfully convicted after a “snitch” testified against him, and he considered Hunt to be a “snitch” against his friend, Wooten; (3) Wallace was sentenced to twenty-five years for this “wrongful” conviction; and (4) he was prosecuted by the same person who was prosecuting Wooten.
 

 Moreover, even without the cross-examination, Wallace’s testimony does not bear the earmarks of credible evidence based on the circumstances surrounding Hunt’s alleged confession to Wallace. As Wallace asserted, although Hunt and Wallace barely knew each other, during their sole, brief conversation, Hunt immediately confessed to falsely implicating Wooten and Jackson in the crime. In this case, in conducting a harmless error analysis, we have considered that there was significant evidence to impeach Wallace and that no other details of the conviction for killing a child were provided.
 

 Further, to the extent that Wallace’s testimony otherwise impeached Hunt, Hunt was not the State’s only witness. Latisha Allen was also at the apartment, saw the kidnapping, and gave testimony consistent with Hunt’s. She additionally testified that Jackson indicated that he intended to kill the victim. Finally, other significant evidence tied Jackson to the victim’s kidnapping and murder, including incriminating statements that Jackson made after the crime occurred.
 

 Considering that the evidence went only to the impeachment of Wallace, that there was other significant permissible impeachment evidence regarding Wallace, and that considerable permissible evidence existed upon which the jury could have properly relied to determine Jackson’s guilt, we hold that any error in allowing impeachment of Wallace was harmless beyond a reasonable doubt.
 
 See, e.g., Riechmann v. State,
 
 581 So.2d 133, 140 (Fla.1991) (hold
 
 *528
 
 ing that while the trial court abused its discretion in admitting German convictions for involuntary manslaughter and negligent bodily harm, the error was harmless under
 
 DiGuilio
 
 after considering all of the facts in the record, specifically all of the evidence that was properly admitted to impeach the defendant).
 

 Erroneous Admission of Evidence
 

 In his second claim, Jackson alleges three separate errors regarding allegedly impermissible evidence: (1) the trial court erred in denying a motion for mistrial after a witness impermissibly testified that Jackson carried a “little pistol”; (2) the trial court erred in admitting evidence that Jackson sold drugs; and (3) the trial court erred in permitting testimony regarding Hunt’s motivation for reporting the crime to the police. For the following reasons, we find the trial court did not err in its rulings.
 

 As to Jackson’s claim involving the gun, the record reflects that while the State was questioning Hunt as to an argument that Hunt had with Jackson concerning some borrowed money, the State asked Hunt whether he left Jackson’s apartment at that point. Hunt responded, “No. He got up in my face. And he always carries a little pistol with him right here in his little waistband.” The defense immediately objected and moved for a mistrial. The court determined that, based on its ruling as to a motion in limine, Hunt should not have mentioned the gun because it did not relate to the date of the crimes, but concluded that the incidental comment did not rise to the level of a mistrial. The court offered to give a curative instruction, but the defense declined.
 

 The trial court should grant a motion for mistrial only “when an error is so prejudicial as to vitiate the entire trial.”
 
 Salazar v. State,
 
 991 So.2d 364, 372 (Fla. 2008) (quoting
 
 England v. State,
 
 940 So.2d 389, 401-02 (Fla.2006)). “[T]his Court reviews a trial court’s ruling on a motion for mistrial under an abuse of discretion standard.”
 
 Id.
 
 at 371.
 

 The State first asserts that this evidence would have been relevant and thus there was no error when the testimony accidently came in. We disagree. In order for this evidence to be relevant, the State must show a sufficient link between the weapon and the crime. For example, in
 
 Amoros v. State,
 
 531 So.2d 1256, 1260 (Fla.1988), the Court held that the trial court did not err in admitting facts that the defendant was seen in possession of a gun on a prior occasion and that the bullet fired from that gun showed that the same weapon was used to kill the victim in the case under review. In reaching this conclusion, the Court stressed that “[sjimply allowing testimony that [the defendant] had possession of a gun does not serve to identify it as the same murder weapon.”
 
 Id.
 
 The evidence became relevant because the State linked the murder weapon to the defendant by showing possession of the weapon, the firing of the weapon, the retrieval of the bullet fired from the weapon from the victim’s body, and the comparison of the two bullets.
 
 See Hunter v. State,
 
 660 So.2d 244, 251 (Fla.1995) (holding that evidence that the defendant possessed the gun shortly after the murder and pointed it at a colleague was relevant and admissible).
 

 In this case, we hold that the trial court correctly ruled that the testimony should not have been admitted. The record contains minimal testimony as to the gun that was used when Jackson kidnapped Paulk. While Morris testified that Jackson possessed a gun at the time, he did not describe the gun. Later in the proceedings, Hunt testified that Jackson usually carried a “little pistol” in his waist
 
 *529
 
 band. Nothing in the record linked the “little pistol” that Hunt described to the gun that Jackson possessed when kidnapping Paulk. Moreover, there was a significant time difference between Paulk’s kidnapping and Hunt’s disagreement with Jackson.
 

 This does not mean, however, that the trial court was required to grant the motion for mistrial. As addressed above, a mistrial should be granted only “when an error is so prejudicial as to vitiate the entire trial.”
 
 Salazar,
 
 991 So.2d at 372. Here, the mention as to the gun was brief; Hunt simply mentioned that Jackson carried it on him. The trial court recognized that this was error and asked defense counsel whether the court should give curative instructions to the jury, which counsel declined. We conclude that the brief mention of possessing a gun was not so prejudicial as to vitiate the entire trial, and thus the trial court did not abuse its discretion in denying a mistrial.
 
 See, e.g., Marek v. State,
 
 492 So.2d 1055, 1057 (Fla.1986) (holding that the trial court properly denied a motion for mistrial even though a policeman improperly testified that he found a gun in the defendant’s truck).
 

 In his second subclaim concerning allegedly impermissible evidence, Jackson alleges that the trial court abused its discretion in admitting evidence that Jackson sold drugs. This Court faced a similar question in
 
 Jorgenson v. State,
 
 714 So.2d 423, 426 (Fla.1998), where the defendant claimed on appeal that the State should not have been permitted to present evidence regarding his activities as a drug dealer. This Court disagreed and held that the trial court did not abuse its discretion in holding that the defendant’s drug dealing was relevant to support the State’s theory of motive.
 
 Id.
 
 at 428. The Court noted that the record established that the defendant was in the business of selling methamphetamine, the victim regularly delivered drugs for the defendant, the victim had stolen from the defendant, and the victim had threatened to turn in the defendant if he cut off her drug supply.
 
 Id.
 

 In this case, a similar motive can be shown. The State’s theory of the case was that the defendant was a drug dealer and the victim stole Jackson’s drugs and money. After Jackson discovered the theft, he apprehended the victim, brought her to a location where he felt safe, bound her and kept her for several hours, and showed her to others as a warning of what would happen if they acted against Jackson’s interests. Moreover, this evidence was relevant to Jackson’s relationship with Hunt. After Hunt helped Jackson with the kidnapping, Jackson invited Hunt to live with him and help him in his other activities, including selling drugs for Jackson. Based on this close relationship, Jackson later made incriminating statements to Hunt, including requesting that he find a flyer about Paulk’s disappearance and his statement “no body, ... no case.” In light of the above, we conclude that the trial court did not err in admitting evidence of Jackson’s drug-selling activities.
 

 In his third subclaim on this issue, Jackson alleges that the trial court erred in permitting Hunt to testify on redirect regarding his actual motivation in talking to the police. The State asserts that this evidence was proper because on cross-examination, the defendant challenged Hunt’s motive for waiting to come forward and alleged that Hunt had other personal motives to testify. The State further argues that this testimony was not hearsay because it was not offered to prove the truth of the matter asserted.
 

 The record shows that on direct examination, Hunt testified that shortly before he went to the police, he and Jackson had a disagreement regarding some money
 
 *530
 
 that Jackson owed Hunt. During the cross-examination of Hunt, Jackson’s counsel asked numerous questions regarding Hunt’s motive in reporting the crime and testifying against Jackson. On redirect, the State asked why Hunt decided to go to the police. Hunt responded that he had heard Jackson had threatened to kill him. Defense counsel objected, asserting that this testimony was hearsay, immaterial, and unduly prejudicial. Because defense counsel questioned Hunt regarding his motives, the trial court held that the door had been opened during the cross-examination. The State then asked Hunt again why he went to the police, and Hunt responded that it was because Jackson’s wife informed him that Jackson had threatened to kill Hunt. Hunt told his brother about this potential threat, and he was afraid that his brother might try to handle the matter himself if Hunt did not go to the police.
 

 As this Court has recognized, hearsay is defined as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”
 
 Penalver v. State,
 
 926 So.2d 1118, 1131 (Fla.2006) (quoting § 90.801(1)(c), Fla. Stat. (2005)) (emphasis omitted). Thus, if the statement is offered for the truth of the facts asserted, then the statement is hearsay and must fall within one of the recognized hearsay exceptions in order to be admitted into evidence.
 
 Id.
 
 at 1132. However, “if the statement is offered for some purpose other than its truth, the statement is not hearsay and is generally admissible if relevant to a material issue in the case.”
 
 Id.
 
 For a statement to be admissible, the purpose for which the statement is being offered (i.e., the motive) must be a material issue in the action.
 
 See
 
 Charles W. Ehrhardt,
 
 Florida Evidence,
 
 § 801.2 (2009 ed.).
 

 In
 
 State v. Baird,
 
 572 So.2d 904 (Fla.1990), a police officer testified on direct examination, over a defense objection, that the officer had received information that the defendant was a major gambler and was operating a major gambling operation in Pensacola. The jury subsequently found the defendant guilty of three counts of racketeering based on activities involving football betting.
 
 Id.
 
 at 905. Even if this testimony was not hearsay, the Court held that the testimony was inadmissible because it was offered only to prove the officer’s motive for investigating the defendant — a subject that is not generally a material issue in a criminal prosecution.
 
 Id.
 
 at 907-08. We did acknowledge, however, that the testimony “would have been admissible on redirect after the defense attempted, during cross-examination, to establish that Mr. Baird had been targeted for prosecution.”
 
 Id.
 
 at 908.
 

 In this case, Hunt’s testimony was not offered to prove the truth of the matter asserted, i.e., whether Jackson had threatened him. Accordingly, it was not hearsay. Moreover, the testimony was elicited only during redirect — after defense counsel questioned Hunt on cross-examination as to his motives and why Hunt waited so long before he contacted the police. By questioning Hunt’s motives during its cross-examination, defense counsel opened the door to this rebuttal. Because defense counsel put Hunt’s motive at issue, counsel cannot claim it was not material or unduly prejudicial. We find that the trial court did not err in permitting this testimony after defense counsel opened the door to this line of inquiry.
 

 Denial of Requested Guilt Phase Jury Instruction
 

 Jackson alleges that the trial court erred in denying his request for a special jury instruction regarding circumstantial evi
 
 *531
 
 dence. In 1981, this Court amended the standard jury instructions to remove a circumstantial evidence instruction as part of the standard jury instructions.
 
 See In re Standard Jury Instructions in Criminal Cases,
 
 481 So.2d 594, 595 (Fla.1981). Jackson contends that the trial court committed error by failing to provide this instruction because, in his case, this instruction would have supported his theory of the case. This Court has rejected similar arguments that it is error to deny a special jury instruction on circumstantial evidence.
 
 See, e.g., Floyd v. State,
 
 850 So.2d 383, 400 (Fla.2002) (rejecting the claim that the defendant was entitled to the former standard instruction on circumstantial evidence because “when proper instructions on reasonable doubt and burden of proof are given, an instruction on circumstantial evidence is ‘unnecessary’ ”);
 
 Branch v. State,
 
 685 So.2d 1250, 1252-53 (Fla.1996) (holding it was not error to refuse to use former standard instruction on circumstantial evidence where jury was fully instructed on reasonable doubt and burden of proof). Thus, we reject this argument.
 

 Denial of Motion for Judgment of Acquittal
 

 In his fourth claim, Jackson asserts that the trial court erred in denying his motion for judgment of acquittal and challenges the sufficiency of the evidence for the first-degree murder conviction. A trial court should not grant a motion for judgment of acquittal “unless there is no view of the evidence which the jury might take favorable to the opposite party that can be sustained under the law.”
 
 Coday v. State,
 
 946 So.2d 988, 996 (Fla.2006). In reviewing the denial of a motion for judgment of acquittal, appellate courts apply a de novo standard of review and do not reverse a conviction where the conviction is supported by competent, substantial evidence.
 
 Pagan v. State,
 
 830 So.2d 792, 803 (Fla.2002). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.”
 
 Simmons v. State,
 
 934 So.2d 1100, 1111 (Fla.2006) (quoting
 
 Bradley v. State,
 
 787 So.2d 732, 738 (Fla.2001)).
 

 The Court applies a special standard of review, however, where a conviction is based wholly upon circumstantial evidence:
 

 Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
 

 Darling v. State,
 
 808 So.2d 145, 155 (Fla.2002) (quoting
 
 State v. Law,
 
 559 So.2d 187, 188 (Fla.1989)). Courts will sustain a conviction based solely on circumstantial evidence so long as the evidence is “(1) ‘consistent with the defendant’s guilt’ and (2) ‘inconsistent with any reasonable hypothesis of innocence.’ ”
 
 Delgado v. State,
 
 948 So.2d 681, 689-90 (Fla.2006) (quoting
 
 Orme v. State,
 
 677 So.2d 258, 261 & n. 1 (Fla.1996)).
 

 The first issue before the Court is whether this case involves wholly circumstantial evidence, as Jackson contends, or whether there is direct evidence, as the State argues. Even if we assume, as Jackson contends, that the case against him was based wholly on circumstantial evidence and that the special standard of review is therefore applicable, we conclude
 
 *532
 
 that the evidence against Jackson is consistent with his guilt and inconsistent with any reasonable hypothesis of innocence.
 
 [10]
 

 Jackson challenges his first-degree murder conviction on the basis that the State did not present sufficient evidence that the victim died based on the criminal agency of another. As to this point, Jackson essentially argues that the medical examiner’s testimony was not strong enough or credible enough. During the trial, Dr. Thomas Beaver testified that the body was found in a shallow grave and its condition was consistent with having been buried for about six months. Because the body was badly decomposed, he was unable to perform a normal autopsy, but examined the remaining tissue and bones. Although he was unable to find a definitive injury to the victim, he classified the victim’s death as “homicidal violence of undetermined etiology.” Dr. Beaver further testified that he did not believe that Paulk died from a drug overdose, based on the amount of drugs in her body at the time of the autopsy. Throughout his testimony, Dr. Beaver stressed that his opinion was based on his significant experience as a medical examiner, as well as the characteristics of the grave site, information he learned about the victim, and common sense.
 

 The credibility and the weight to be given to this evidence are determinations for the jury. This Court’s review is limited to ensuring that the State presented competent, substantial evidence that is consistent with the defendant’s guilt and inconsistent with any reasonable hypothesis of innocence.
 

 The State presented competent, substantial evidence that is consistent with Jackson’s guilt. Evidence showed that the victim stole Jackson’s drugs and money while he slept. After he woke up, he contacted friends and acquaintances, searching for Paulk until he found her. Jackson, who was armed with a gun, then took Paulk to a place that he felt was safe — Allen’s apartment. He bound the victim and kept her in the bathroom, showing her to his closest friends and explaining that Paulk had stolen from him. Allen asked Jackson if he was going to kill Paulk, and Jackson nodded his head yes. Once it was dark outside, Jackson used duet tape to further bind the victim and, after lookouts were posted, carried the victim to the trunk of his car, ignoring her pleas and overcoming her struggles. Paulk, who kept in frequent contact with her family, was not seen alive after that time. After her disappearance, Jackson made several incriminating statements, including, “no body, ... no case.” Approximately six months after her disappearance, Paulk’s naked and decomposing body was discovered in a shallow grave.
 

 The evidence presented was also legally sufficient to contradict Jackson’s hypothesis of innocence and thereby enable the jury to find Jackson guilty of first-degree murder. Throughout the trial, Jackson asserted that he did not kill the victim and that she either died at the hands of another or died accidently and whoever was with her panicked and buried her. Jackson presented evidence suggesting a potential serial killer. However, evidence presented by the State established numerous significant differences between this case and the murders committed by the serial killer: the victims in the serial mur
 
 *533
 
 der cases were prostitutes who were known to visit a particular intersection; they were killed between the end of December 2005 and the end of February 2006; they each died after being shot in the head; and their bodies were left in the open without any attempt at concealment. All of these aspects of the other murders were inconsistent with Paulk’s murder.
 

 Jackson also relied on the premise that it was possible that Paulk disappeared based on outstanding warrants for her arrest and that somebody else caused her death or that she died accidently. However, the State presented numerous family members and friends who knew Paulk and had almost daily contact with her, regardless of the prior outstanding warrants. None of her family or friends saw or heard from Paulk after Jackson kidnapped her. While Paulk did use illegal drugs, the medical examiner ruled out an overdose as the cause of death.
 

 The State does not need to present evidence proving the exact manner of the victim’s death or the location of the murder.
 
 See, e.g., Crain v. State,
 
 894 So.2d 59, 72-74 (Fla.2004) (affirming murder conviction based on circumstantial evidence, despite the fact that the State did not establish how the murder occurred or present the body of the victim). Because competent, substantial evidence supports the jury’s findings and because this evidence is “consistent with the defendant’s guilt” and “inconsistent with any reasonable hypothesis of innocence,” we hold that the trial court did not err in denying the defendant’s motion for judgment of acquittal.
 

 Denial of Requested Penalty Phase Jury Instructions
 

 Jackson claims that the trial court erred in denying his request for several jury instructions during the penalty phase.
 
 [11]
 
 We reject each of Jackson’s claims that the giving of the standard penalty phase instructions, without further special instructions, constitutes reversible error in this case.
 
 [12]
 

 CCP
 

 In his sixth claim, Jackson challenges the trial court’s finding of CCP, asserting that (1) the trial court engaged in impermissible doubling because it relied on the same facts to determine two different aggravators; (2) Jackson had a pretense of justification because Paulk stole from him; and (3) there is insufficient evidence to support this aggravator, especially in light of the fact that no one knows how Paulk died. As this Court has held, when a party contends that the State
 
 *534
 
 failed to prove an aggravating circumstance beyond a reasonable doubt,
 

 it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt—that is the trial court’s job. Rather, our task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.
 

 Woodel v. State,
 
 985 So.2d 524, 530 (Fla.2008) (quoting
 
 Willacy v. State,
 
 696 So.2d 693, 695-96 (Fla.1997)).
 

 Jackson first challenges the application of CCP, asserting that the trial court engaged in impermissible doubling because it relied on the same facts to determine that CCP applied and that the crime occurred during a kidnapping. This Court has previously held, “So long as each aggravator is supported by such distinct facts, we hold that no impermissible doubling of aggravating factors has occurred.”
 
 Stein v. State,
 
 632 So.2d 1361, 1366 (Fla.1994). Thus, in
 
 Stein,
 
 the Court rejected the argument that the trial court impermissibly doubled two aggravators (CCP and the avoid arrest aggravator) because CCP focused on the manner in which the murder was executed, while the avoid arrest aggravator focused on the dominant motive for the murder.
 
 Id.
 

 Here, no impermissible doubling occurred because each aggravator focused on distinct facts. Additional facts beyond the kidnapping established CCP, including the facts that Jackson was clearly hunting for the victim; he did not release the victim although he clearly had the opportunity to do so; he directed others to obtain additional items such as duct tape so that he could better secure the victim once she realized that her life was in danger; and, most significantly, Jackson told one of his friends that he was going to kill the victim.
 

 In his next challenge to this ag-gravator, Jackson alleges that even though he did not have a legal justification for the murder, he had a “pretense of justification” for the murder because the victim stole from him. This claim is meritless. As the trial court noted, Jackson did not argue any pretense of justification at trial or introduce any evidence to support a justification for the murder. Moreover, a pretense of legal or moral justification is defined as “any colorable claim based at least partly on uncontroverted and believable factual evidence or testimony that, but for its incompleteness, would constitute an excuse, justification, or defense as to the homicide.”
 
 Salazar,
 
 991 So.2d at 376-77 (quoting
 
 Nelson v. State,
 
 748 So.2d 237, 245 (Fla.1999)). While Jackson may have murdered the victim because she stole from him, this does not amount to a pretense of justification.
 
 See, e.g., Cox v. State,
 
 819 So.2d 705, 721-22 (Fla.2002) (rejecting the defendant’s claim of a legal or moral justification for murder where the defendant asserted he was justified in the killing because the victim stole from the defendant).
 

 Finally, Jackson alleges that there is insufficient evidence to support CCP because the evidence does not show that Paulk knew she was going to die and no one knows how Paulk died. The CCP aggravator does not rely upon when the victim realized that his or her death was imminent, but focuses on the defendant’s state of mind and how he planned the murder.
 
 See, e.g., Duest v. State,
 
 855 So.2d 33, 45 (Fla.2003) (recognizing that CCP focuses on a defendant’s “state of mind, intent and motivation”);
 
 Franklin v. State,
 
 965 So.2d 79, 98 (Fla.2007) (recognizing that to prove CCP, the defendant
 
 *535
 
 must have a careful plan to commit the murder before the incident and exhibit heightened premeditation). Here, the evidence clearly establishes that Jackson made the decision to kill the victim well in advance of the murder. He admitted this plan to others. In addition, he kept the victim for a significant period of time before he carried out this plan, and while he waited until it was dark, he procured more secure methods of restraining her. Competent, substantial evidence supports the trial court’s finding that CCP applied.
 

 Proportionality of the Death Sentence
 

 In his final claim, Jackson challenges whether the sentence of death is proportional. Because the death penalty is reserved only for those cases where the most aggravating and least mitigating circumstances exist, this Court must undertake a proportionality review “in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (citation omitted). In performing this review, the Court considers the totality of the circumstances and compares the case with other similar capital cases.
 
 See Duest,
 
 855 So.2d at 47. The Court does not simply compare the number of aggravating and mitigating circumstances, but rather performs a qualitative review of the underlying basis for each aggravator and mitigator.
 
 See Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998).
 

 We find the death penalty is a proportionate punishment for the first-degree murder of Pallis Paulk. In
 
 Walker v. State,
 
 957 So.2d 560 (Fla.2007), the defendant was convicted of murdering a victim he thought might be a DEA agent. He waited for the victim to arrive at a certain location, beat the victim severely, put him in the trunk of a car, took him to a remote location, and killed him.
 
 Id.
 
 at 565-66. The trial court sentenced the defendant to death, finding three aggravators (committed during the course of a kidnapping, HAC, and CCP) and four mitigators (the defendant’s drug use/bipolar personality/sleep deprivation; the life sentence of a codefendant; the defendant’s statement to police; and the defendant’s remorse).
 
 Id.
 
 at 585. On appeal, this Court affirmed the sentence, finding the death penalty was proportional.
 
 Id.; see also Delgado,
 
 948 So.2d at 691 (holding that death was proportionate where the defendant murdered two people after the victims allegedly tricked him into a bad deal, where the trial court found three aggravators (CCP, HAC, and a prior violent felony conviction) and four nonstatutory mitigators (Delgado never used drugs or alcohol; he had a difficult childhood and suffered physical and emotional abuse; he loved his family; and his behavior throughout trial was appropriate)).
 

 In this case, the jury recommended that Jackson be sentenced to death by a vote of nine to three. As to codefendant Wooten, the jury recommended life imprisonment.
 
 [13]
 
 The court agreed with the jury’s recommendation and sentenced Jackson to death, finding three aggravating circumstances (a prior violent felony; that the murder was committed while engaged in a kidnapping; and CCP), no statutory mitigation, and twelve nonstatutory mitigating factors. While the court gave most of the mitigators little weight, one was assigned great weight (Jackson’s diagnosis of bipolar disorder and earlier hospitalizations as
 
 *536
 
 a child for mental issues) and one was assigned some weight (abuse and abandonment during childhood). Further, as to his traumatic childhood, the trial court, while assigning it some weight, explained that “[t]he evidence also showed that the defendant was approximately thirty years of age when this murder took place, has a high intelligence level, and as an adult participated in running some small businesses.” After comparing the totality of the circumstances in this case with other capital cases, we conclude that the sentence of death is proportional.
 

 CONCLUSION
 

 For the above reasons, we affirm Jackson’s convictions for first-degree murder and kidnapping and his death sentence for the murder of Pallis Paulk.
 

 It is so ordered.
 

 QUINCE, C.J., and PARIENTE, LEWIS, CANADY, POLSTON, LABARGA, and PERRY, JJ., concur.
 

 [1]
 

 . The State presented numerous eyewitnesses. Curtis Vreen was Paulk’s friend who supplied her with drugs and testified that Jackson took Paulk from Vreen’s house. Calvin Morris was her cousin who was with Paulk when she stole from Jackson; he also saw Jackson kidnap Paulk. Latisha Allen was Jackson's close friend; she saw the victim bound and testified that Jackson affirmed he intended to kill Paulk after she stole from him. Frederick Hunt was another one of Jackson's friends; he also saw Paulk bound and under Jackson's control and assisted Jackson in forcing Paulk into the trunk of the car.
 

 [2]
 

 . According to evidence presented at trial, codefendant Wooten drove a red hatchback.
 

 [3]
 

 . At the time, Hunt, Allen, Dewayne Thomas (Allen’s boyfriend), and Charles Bush all lived in Allen's apartment, along with Allen’s child.
 

 [4]
 

 . Shortly before Jackson arrived, Thomas and Hunt left the apartment and were stopped by police. The police arrested Thomas for driving without a license. Allen learned about the arrest and arrived at the scene to retrieve the car and Hunt. Based on this arrest, which occurred on the same day as the kidnapping, the evidence established that Paulk was kidnapped on November 9, 2004.
 

 [5]
 

 . Allen also testified that Jackson asked Allen for a douche, so she gave him one. At trial, the State argued that Jackson needed the douche to remove any potential DNA evidence because Paulk and Jackson spent the prior night together and presumably had sex before Paulk stole Jackson's drugs and money.
 

 [6]
 

 . Jackson made a similar statement to another acquaintance.
 

 [7]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [8]
 

 . The court found the following mitigators: (1) Jackson was severely neglected and abandoned during childhood and suffered extreme loss of family and self-image at an early age (given some weight); (2) Jackson suffered from a very abusive childhood, both from his family and while in foster care (given little weight); (3) Jackson suffered from serious mental health issues (bipolar disorder) and was involuntarily hospitalized in mental health hospitals for several years (given great weight); (4) Jackson has a special bond and is good with children (given little weight); (5) Jackson is capable of forming loving relationships with family members and friends and has the support of his family (given little weight); (6) Jackson has been a good and supportive son, brother, father, and husband (given little weight); (7) Jackson has biological children and a stepchild with whom he has bonded and who need his support and love (given little weight); (8) Jackson has worked and contributed to his family and society in his various jobs (given little weight); (9) Jackson had a good and close relationship with his neighbors (given little weight); (10) Jackson was a caring child and adult and tried to help people (given little weight); (11) Jackson demonstrated appropriate courtroom behavior throughout the course of the trial (given very little weight); and (12) Jackson can receive a life sentence and will die in prison (given little weight).
 

 [9]
 

 . On appeal, Jackson presents the following claims: (1) he is entitled to a new trial because of improper impeachment by the State coupled with improper argument to the jury by the prosecutor; (2) the trial court erred in allowing into evidence matters that were irrelevant and prejudicial; (3) the trial court erred in denying Jackson’s request for an instruction regarding circumstantial evidence; (4) the trial court erred in denying Jackson's motion for judgment of acquittal on the ground that evidence failed to show that the victim died by the criminal agency of another; (5) the trial court erred in denying Jackson's requested jury instructions in the penalty phase; (6) the trial court imposed the death penalty upon an erroneous finding that the murder was committed in a cold, calculated, and premeditated manner (CCP); and (7) Jackson's sentence of death is disproportionate.
 

 [10]
 

 . As a part of our review in direct appeal capital cases, this Court must conduct an independent review of the record for sufficiency of the evidence.
 
 Carter v. State,
 
 980 So.2d 473, 480 (Fla.),
 
 cert. denied,
 
 - U.S. -, 129 S.Ct. 400, 172 L.Ed.2d 292 (2008); Fla. R.App. P. 9.140(i). For the reasons also addressed in this section, we find that competent, substantial evidence exists to support Jackson’s convictions.
 

 [11]
 

 . The record reflects that in this case, defense counsel requested that the judge define reasonable doubt by giving the full reasonable doubt instruction that was initially given in the guilt phase. The judge denied the request, informing counsel that the jury had already heard this instruction and the attorneys could remind the jury during argument. Defense counsel also requested numerous other special jury instructions, including an instruction on the defendant not testifying; an instruction pertaining to Jackson’s prior violent felony convictions; a special instruction regarding the CCP aggravator; an instruction that the sentence of death is never required; and special instructions relating to each of the proposed nonstatutory mitigators that Jackson suggested.
 

 [12]
 

 . On many of the requested jury instructions, Jackson summarily argues that the trial court committed reversible error and merely cites to the portions of the record where counsel requested those special instructions. Such summary arguments are insufficient to raise these claims on appeal.
 
 See Duest v. Dugger,
 
 555 So.2d 849, 852 (Fla.1990) ("The purpose of an appellate brief is to present arguments in support of the points on appeal. Merely making reference to arguments below without further elucidation does not suffice to preserve issues, and these claims are deemed to have been waived.”).
 

 [13]
 

 . Jackson does not raise any issue concerning the relative culpability of his codefendant and the relative disparity in the sentences.