# First District Court of Appeal
## State of Florida

———————————————

No. 1D17-1469

———————————————

Joshua David Lee,

    Appellant,

    v.

State of Florida,

    Appellee.

———————————————

On appeal from the Circuit Court for Bay County.
Kathleen Dekker, Senior Judge.

April 3, 2019

Kelsey, J.

Appellant, convicted of aggravated stalking, claims the trial court improperly admitted into evidence his victim's 911 call and three of his jail calls to the victim. He argues that without this evidence, he could not have been convicted of aggravated stalking. We find no legal error or abuse of discretion, and affirm.

**Aggravated Stalking**

Aggravated stalking occurs when a person "willfully, maliciously, and repeatedly follows, harasses, or cyberstalks another person and makes a credible threat to that person." § 784.048(3), Fla. Stat. (2016). To "harass" is "to engage in a course of conduct directed at a specific person which causes substantial emotional distress to that person and serves no legitimate purpose." § 784.048(1)(a). "'Course of conduct' means a pattern of conduct composed of a series of acts over a period of

time, however short, which evidences a continuity of purpose." § 784.048(1)(b). To "cyberstalk" is "to engage in a course of conduct to communicate, or to cause to be communicated, words, images, or language by or through the use of electronic mail or electronic communication, directed at a specific person, causing substantial emotional distress to that person and serving no legitimate purpose." § 784.048(1)(d). A minimum of two acts is required to establish stalking. *Pickett v. Copeland*, 236 So. 3d 1142, 1144–45 (Fla. 1st DCA 2018) (citing *Carter v. Malken*, 207 So. 3d 891, 894 (Fla. 4th DCA 2017)).

### Appellant's Texts to the Victim

At trial the State introduced photographs a deputy sheriff took of three text messages on the victim's phone. A 12:28 p.m. message from the victim to Appellant said "Im [sic] calling the sheriff." At 3:12, Appellant replied, "Call the g*dd*n sheriff. See if a piece of paper [no-contact order] stops me from treating you the way you deserve. Trust me you'll be getting yours." A second incoming message from Appellant at 3:14 said, "You f*ing whore. You are gonna die today." Both the deputy and the victim authenticated these photographed messages at trial.

### 911 Call

Appellant was subject to a court order that he have no contact with his ex-girlfriend. She called 911 on an evening when she said Appellant had been sending her "death threats all day" in text messages and twelve to fifteen voice mail messages that were "very explicit, very, very scary." She said Appellant had given her an ultimatum: meet with him that evening, or wait a few days and he would break down her door and "cut out [her] throat with a paring knife." She asked the dispatcher to "make it urgent" because she had agreed to Appellant's demand that she meet him to talk, and she had "flushed him out" and wanted him picked up at the pre-arranged meeting place. She said she could not go home, because "he will bust in the door." She said she had made arrangements for herself and her daughter to spend the night at friends' homes out of fear of Appellant. While on the phone with the dispatcher, the victim had started following a deputy in traffic in hopes of getting immediate help, but the

2

dispatcher instructed the victim to park in a safe place and await a deputy dispatched specifically for her call.

A deputy responding to the 911 call found the victim "distraught and in fear for her life." This deputy photographed some of the text messages on the victim's cell phone. This deputy did not locate or apprehend Appellant at that time; but within about an hour, the victim flagged down another deputy and asked for a ride back to her car, repeating her concerns about Appellant. When they arrived at her car, Appellant walked up. The second deputy testified that the victim "seemed panic stricken" upon seeing Appellant, and that Appellant seemed impaired. This deputy separated Appellant and the victim, and called for the first deputy to respond to the scene. Appellant was arrested for aggravated stalking.

## Jail Calls

Three recorded jail calls between Appellant and the victim were introduced into evidence, the first two within moments of each other the evening of Appellant's arrest, shortly after he had been booked into jail; and the third call several weeks later. By stipulation, counsel had redacted material deemed potentially prejudicial to Appellant. In the first call, Appellant was angry and claimed that he had merely wanted to meet the victim for dinner and to talk. The victim summarized Appellant's threats in explicit language very similar to what she had used in the 911 call, which she testified at trial was the truth: "You were the one telling me that if I didn't go with you that you were going to destroy my bike and my car and my house and you're going to cut my throat out with a paring knife, you would p*ss into my neck and watch me gurgle and die." That call ended when someone came to fingerprint Appellant, and Appellant immediately called her back. In the second call, after discussing damage Appellant had apparently caused to the victim's motorcycle, which Appellant denied causing, Appellant told the victim she had "f*d up majorly this time."

Although there were 47 recorded jail calls between the two, the only additional one admitted at trial occurred several weeks after Appellant was arrested. Appellant apologized: "I'm sorry for saying all that s*t to you. You know I didn't mean any of that, I

3

was just upset." He claimed that on the day of his arrest, he had been sleep-deprived, had drunk some vodka, and "I don't even remember what I wrote to you. And then, or what I was calling and saying. I don't really, I don't know what I did." The victim repeated that she "was absolutely terrified, it was worse than anything you can imagine." Appellant apologized again: "Well, like I said, I'm sorry, I didn't mean anything by that. You know I would never do anything like that." He repeated that he only wanted to meet up with the victim that evening to so they could have dinner together.

## Evidentiary Objections

Appellant objected to the 911 call and the jail calls on grounds of confrontation clause and hearsay. The defense also made a boilerplate objection at the close of evidence: "And if we can go ahead now and renew all objections and evidentiary rulings." The victim's testifying at trial resolved the confrontation clause objections, and the trial judge overruled the hearsay objections.

As to the 911 call, the trial judge had listened to the recording before trial and concluded that it was admissible as an excited utterance. The judge described the victim's speech as "very fast . . . abnormally fast," with an "[o]ccasional stutter" and a "fairly fast" breathing pattern. The judge noted that "she was so upset that she was trying to follow a deputy" even though she had no idea where that deputy was going, and was so afraid to go home that she "was upset and wanting urgently to get assistance . . . In other words, she was seeking safety." The judge noted that in context, the victim was not merely reporting a past crime, but was concerned for her safety against an upcoming confrontation with Appellant: "It was, you've got to get to him because he's after me. . . . It was a cry for help." The judge interpreted the victim's statements about death threats not as planting contrived information, but rather given genuinely in response to the 911 operator's questioning. The trial court ruled that the 911 calls would be admitted as a non-testimonial excited utterance exception to the rule against hearsay.

In response to Appellant's hearsay objection to the jail calls, the prosecutor argued that the victim's statements in the calls

4

were not being offered for their truth. Rather, the State offered the jail calls as evidence of Appellant's admissions. In closing argument, the defense referred to the third jail call as evidence that Appellant had no intention of hurting the victim that evening, but just wanted to meet her for dinner.

## Standard of Review

A trial court's decision to admit evidence is generally reviewed for abuse of discretion. *Hudson v. State*, 992 So. 2d 96, 107 (Fla. 2008). That discretion, however, is limited by the rules of evidence. *Id.* Whether a statement is hearsay is a legal question reviewed de novo. *Powell v. State*, 99 So. 3d 570, 573-74 (Fla. 1st DCA 2012) (examining hearsay definition and excited utterance questions de novo). We do not re-weigh evidence, and will affirm if competent evidence supports the judgment. *Brand v. Fla. Power Corp.*, 633 So. 2d 504, 513 (Fla. 1st DCA 1994) (citing *Shaw v. Shaw*, 334 So. 2d 13, 16 (Fla. 1976)).

## Analysis

Appellant argues that neither the 911 call nor the jail calls qualified as an excited utterance or spontaneous statement, and both were inadmissible hearsay, without which there was insufficient competent evidence to convict him. He argues that without these calls, there was just "one text message," which was insufficient to sustain his conviction. His principal argument against admissibility of the 911 call is that it occurred several hours after the texted death threat, which allowed sufficient time for the victim to be free from the effect of a startling event, and to have had time to reflect or fabricate. He argues that the same reasoning applies to the jail calls, which he claims could not be considered party admissions because Appellant did not agree with what the victim said on those calls.

**911 Call/Excited Utterance.** We affirm the trial court's ruling that the 911 call was properly admitted as an excited utterance. *See* § 90.803(2), Fla. Stat. (defining excited utterance as a "statement . . . relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition"). As we have held, to fall within

this exception, an otherwise hearsay statement must meet the following elements:

> (1) there was an event startling enough to cause nervous excitement; (2) the statement was made before the declarant had time to reflect or contrive; and (3) the statement was made while the declarant was under the stress or excitement caused by the event.

*Powell v. State*, 99 So. 3d 570, 573–74 (Fla. 1st DCA 2012). We noted in *Powell* that "[t]he stress that justifies the admission of the statement can exist for a significant period of time after the startling event is over." *Id.* at 574.

As the trial court correctly noted, it was not just Appellant's graphic threats by text and voicemail leading up to the 911 call that evidenced the victim's state of fear and "nervous excitement," but also the impending confrontation with Appellant on which he had insisted, subject to a death threat. The death threat was expressed in Appellant's two text messages: "Trust me you'll be getting yours. . . . You f*ing whore. You are gonna die today." In addition, the death threat was expressed in the victim's words: "[T]he only options I have are to meet him . . . and talk to him or wait a few days and . . . then he's going to surprise me and he's going to bust in my door and cut out my throat with a paring knife." The planned confrontation was confirmed when Appellant walked up to the victim's car in the presence of a deputy at the appointed time, causing panic in the victim. This victim was under the stress of not just the earlier texts and voicemails, but also the imminent confrontation.

Although Appellant argues that the 911 call could not qualify as an excited utterance because the gap of time between his second texted death threat and the 911 call gave the victim time to reflect and contrive, it is undisputed that she did not contrive the texted death threats. She did not make up her statements about Appellant's expecting an evening meeting, that he was on foot on his way to that meeting, or the place of the meeting—all of which were confirmed by Appellant's actions. As the trial judge noted, the victim was so desperate to get help before that meeting occurred that she started following a random deputy in traffic, and her voice and speech patterns on the 911 tape evidenced her

6

state of fear. The first deputy who responded to the 911 call and talked with the victim testified that the victim was "distraught and in fear for her life." The second deputy, with the victim when Appellant approached for that evening meeting, testified that she was panic-stricken. This evidence sufficed to establish the excited-utterance exception to the rule against hearsay.

These facts are analogous to those in *Werley v. State*, 814 So. 2d 1159 (Fla. 1st DCA 2002). The victim of a domestic battery called 911 an hour later, as she was walking down the road away from the house. She told the 911 operator that her husband had beat her and that if she did not get off the road, he would come after her and beat her again. *Id.* at 1161. Like the victim here, the victim in *Werley* was found by responding officers to be visibly upset, frightened, and short of breath. *Id.* We affirmed the trial court's assessment that the 911 call satisfied the excited utterance exception. *Id.*; *see also Rolle v. State,* 215 So. 3d 75, 80 (Fla. 3d DCA 2016) (finding victim's statement made "a few hours" after the startling event qualified as an excited utterance given evidence of the victim's ongoing state of trauma); *Edmond v. State*, 559 So. 2d 85, 86 (Fla. 3d DCA 1990) (finding excited utterance exception applied to statements made two to three hours after crime was committed, where witness was still frightened and emotional). These cases are necessarily fact-specific, and on the facts presented here, the trial judge did not err in ruling that this victim's statements to the 911 operator constituted excited utterances.

**The Jail Calls.** Counsel for both parties cooperatively stipulated to redacting from the recorded jail calls statements that could be damaging to Appellant. In response to Appellant's objections to placing the victim's statements before the jury, the State argued that the jail calls were not being offered for their truth, but rather to establish Appellant's adoptive admissions and his assertion of another threat the very evening of his arrest. In the calls, the victim repeated statements she had made in the 911 call, almost verbatim; and by that stage of the trial, the victim had testified under oath that her 911-call statements were the truth. In closing argument, Appellant's counsel even utilized Appellant's jail call statements about merely wanting to meet the victim for dinner, to argue lack of any criminal intent.

These facts do not demonstrate reversible error. The victim's statements, offered for a purpose other than truth—here, to provide context for Appellant's responses—are not hearsay. *See Jackson v. State*, 25 So. 3d 518, 530 (Fla. 2009) (repeating general rule that a relevant statement offered for a purpose other than its truth is not hearsay). Appellant's acts—text messages, physical approach, and the mere fact of the two phone calls in addition to their content—constituted a "course of conduct" for purposes of the stalking statute. § 784.048(1)(b), Fla. Stat.; *Carter*, 207 So. 3d at 894 (requiring a minimum of two acts to constitute stalking).

AFFIRMED.

WETHERELL and MAKAR, JJ., concur.

_____

***Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.***

_____

Andy Thomas, Public Defender, and Greg Caracci, Assistant Public Defender, Tallahassee, for Appellant.

Ashley Moody, Attorney General, and Daniel Krumbholz, Assistant Attorney General, Tallahassee, for Appellee.