# Supreme Court of Florida

_____

No. SC12-1159
_____

**RAY JACKSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 5, 2014]

PER CURIAM.

Ray Jackson and codefendant Michael Wooten were indicted and tried together for the kidnapping and first-degree murder of Pallis Paulk. Jackson v. State, 25 So. 3d 518, 522 (Fla. 2009). Both defendants were convicted of the crimes, and Jackson was sentenced to death. On direct appeal, this Court affirmed Jackson's convictions and sentence of death. Id. at 536.

Jackson filed an initial motion to vacate his judgment of conviction for first-degree murder and sentence of death, pursuant to Florida Rule of Criminal Procedure 3.851. In addition, he filed a motion for DNA testing, pursuant to

Florida Rule of Criminal Procedure 3.853. After holding an evidentiary hearing on some of the claims, the postconviction court denied relief, a holding that Jackson contests. The postconviction court also denied his request for DNA testing.

Because the order concerns postconviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction of the appeal under article V, section 3(b)(1), of the Florida Constitution. For the reasons set forth below, we affirm the denial of postconviction relief and affirm the denial of DNA testing.

**FACTS**

On direct appeal, this Court summarized the relevant facts of this case as follows:

> When Pallis Paulk was last seen alive by an acquaintance on November 9, 2004, she was being forced into the trunk of a car by Jackson. Her body was found in a shallow grave several months later. The facts at trial concerning her murder came in through a series of witnesses by which the following factual scenario was presented.
> Around 3 a.m. on the morning of November 9th, Paulk arrived at a friend's house, looking for ecstasy pills. Her friend, Curtis Vreen, testified that Paulk arrived in a red hatchback. He noticed that there was someone else in the car, but he could not see the person's face. Vreen gave her half of an ecstasy pill and told her that was all he had.
> Later that day, Paulk called her sixteen-year-old cousin, Calvin Morris, and told Morris, "I have a lick for you, Cuz," which meant that she found a person to rob. Morris met Paulk at an apartment in Daytona Beach, and when Morris arrived, he saw Ray Jackson sleeping in bed. Concerned that Jackson might wake up, Morris walked back to the car and waited for his cousin. Paulk arrived at the car, carrying a Sponge Bob bag, which contained about two ounces of cocaine, some marijuana, and approximately $800. She also had

men's jewelry and a cell phone that did not belong to her. Together, they drove to pick up Morris's girlfriend in Sanford, Florida, and smoked some of the marijuana. While they were driving, Paulk called Vreen, looking for more ecstasy.

At some point after Paulk left Jackson's apartment, Jackson woke up and realized the theft. Jackson and codefendant Wooten went to Latisha Allen's apartment and asked to speak to Frederick Hunt, who was Vreen's cousin. Based on Jackson's request, Hunt called Vreen to see if he had heard from Paulk. Vreen responded that Paulk had called him and provided the phone number from which Paulk had called Vreen. After Hunt relayed this information to Jackson, Jackson left.

Later in the day, Morris took Paulk to Vreen's house, even though Morris was afraid that Jackson would be there looking for Paulk. Paulk went inside, telling Morris that she would be right back. While Morris was waiting in the car, Wooten came outside and told Morris that Paulk was using the restroom. Jackson and Paulk eventually came out of the house and walked up to Morris's car. Morris saw that Jackson had a gun. Jackson asked, "Where is my stuff at?" Morris immediately gave Jackson his marijuana back. Paulk retrieved some additional items from Morris's car and then left with Jackson.

Morris noticed that Paulk looked upset, like she wanted to cry. According to Morris, Jackson shoved Paulk into the back of a red hatchback, and Jackson, Wooten, and Paulk drove away. Morris initially followed them, but stopped after Jackson held a gun out of the window. Morris immediately went to his grandmother's house and told her what had happened, but did not go to the police at that time because he had outstanding warrants against him.

Jackson took Paulk to Allen's apartment. Although Hunt, Thomas, and Allen were not there when he first arrived, Jackson had keys to Allen's apartment. Allen and Hunt returned to Allen's apartment and saw a red hatchback parked in front. Jackson was inside, sitting by the hallway that led to the bedrooms. Jackson told Allen that he had been robbed and asked her to go look. Allen went into the bathroom where she saw a woman in her bathtub, dressed but with her hands tied behind her back. The woman told Allen that she was fine and that it was her fault. After Allen left the bathroom, Wooten told her not to be "dumb" like the victim or she could end up the same way. Allen asked if Jackson was going to kill the woman,

and he nodded yes. Allen left to bail her boyfriend out of jail, but Hunt remained.

Although a number of people were in Allen's apartment, Wooten and Jackson were the only people who entered the bathroom after Allen left. Jackson asked if anybody wanted to "have fun" with Paulk, but no one responded. Jackson obtained duct tape and, after putting on some gloves, went into the bathroom with the duct tape.

Once night fell, Jackson had several people serve as lookouts. Jackson then retrieved Paulk and carried her over his shoulder to one of his cars, a blue Oldsmobile Delta 88. As they neared the car, Paulk pleaded with Jackson not to put her in the trunk. Despite her pleas, Jackson forced Paulk into the trunk. Paulk resisted, straightening her legs so the trunk lid would not close. Jackson punched her in the face, Hunt hit Paulk in the back of her legs, and they were finally able to close the trunk. After retrieving his keys, Jackson left. Paulk's friends and family never saw her alive again.

After Hunt helped in Paulk's kidnapping, Hunt and Jackson became much closer. Hunt moved in with Jackson, selling drugs for Jackson, answering his phones, and running different errands for him. At some point, Hunt heard that a body had been found and told Jackson. Jackson called somebody and asked that person to go to the spot, but to "step lightly" and then call him back. On a different occasion, when Hunt had Jackson's phone, a person from Paulk's family called, accusing Jackson of doing something with Paulk. When Hunt informed Jackson about the call, Jackson replied that he was not "worried about it because they ain't got no body, they ain't got no case." After Paulk's family posted flyers about Paulk in an attempt to find her, Jackson asked Hunt to find one of the flyers and tried to hang it up on his wall. Before Paulk's body was found, Hunt and Jackson's relationship soured after Jackson borrowed $800 from Hunt to buy cocaine and never repaid the money.

On April 17, 2005, Paulk's body was discovered in a shallow grave. There were no visible signs of injury, but her body was severely decomposed. Using dental comparisons, a forensic dentist affirmatively identified the body as Pallis Paulk. The medical examiner opined that the cause of death was homicidal violence of undetermined etiology. Although he was unable to determine the precise method of death, he ruled out a drug overdose after reviewing the toxicology report. Shortly after Paulk's body was discovered,

Hunt and Allen approached the police together, providing information regarding Paulk's disappearance.

At trial, in his defense, Jackson presented Captain Brian Skipper, an officer with the Daytona Beach Police Department, who testified about an alleged serial killer who murdered three women between December 26, 2005, and February 24, 2006. However, on cross-examination, the State demonstrated substantial differences between those crimes and the murder of Paulk.

During codefendant Wooten's defense, Wooten called Quentin Wallace, a fellow inmate who testified that while Hunt was in prison, Hunt talked to him about his own case and said that he had lied about both Wooten and Jackson and that Wooten was not even there. Wooten also testified, alleging that he lived in Jacksonville at the time of the crime and was at work on the day that the kidnapping occurred. He further denied owning a red hatchback at the time of the crime.

Based on the above evidence, by special verdict forms, the jury found that Jackson was guilty of first-degree murder under the theories of premeditated murder and felony murder. The jury found that Wooten was guilty of only first-degree felony murder. The jury found that both Jackson and Wooten were guilty of kidnapping.

Jackson, 25 So. 3d at 522-24 (footnotes omitted).

During the penalty phase, the State presented victim impact statements from family and friends, as well as a stipulation from Jackson that announced that Jackson had previously been convicted of robbery, battery on a law enforcement officer, and resisting arrest with violence. Id. at 524-25. Jackson then presented a significant amount of mitigating evidence that this Court summarized as follows:

Jackson called numerous witnesses who testified about the poor conditions in which he grew up. According to these witnesses, both Jackson and his younger brother, Thayer, lived with their mother, who abused drugs and disappeared for weeks at a time. Jackson became a father figure and made sure that they had enough food to eat. After Jackson's younger sister died, Jackson tried to hang himself. Both of the boys entered the foster care system. Thayer's aunt raised Thayer,

but was unable to take Jackson. Jackson went to a mental health facility, where he stayed for a considerable period of time. Jackson's wife also testified, asserting that Jackson was a good worker, a good neighbor, a good provider, good to children, generous to others, and had two children who needed him.

Finally, Dr. [Jeffrey] Danziger, a psychiatrist, reviewed Jackson's prior mental health history records, as well as other aspects of the case. Dr. Danziger opined that Jackson suffers from "bipolar disorder type II," a mood disorder in which a person swings from depressive episodes to manic episodes. Dr. Danziger thought it was very unusual that Jackson attempted to hang himself at the age of eight and was in a mental hospital at Macclenny from the age of eight until he was almost ten.

Id. at 525.

The jury recommended that Jackson be sentenced to death by a vote of nine to three. Id. Codefendant Wooten, however, received a life sentence, pursuant to the jury's recommendation. Id. at 535. After holding a Spencer[1] hearing in Jackson's case and after considering the jury's recommendation, the trial court sentenced Jackson to death, concluding that the aggravators outweighed the mitigators. Id. at 525. In making this determination, the trial court found three aggravators, no statutory mitigation, and twelve nonstatutory mitigating factors.[2]

_____

1. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

2. The trial court found the following aggravators: (1) Jackson was previously convicted of a prior violent felony; (2) the capital felony was committed while Jackson was engaged in the commission of a kidnapping; and (3) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP). The trial court found the following as nonstatutory mitigation: (1) Jackson was severely neglected and abandoned during childhood and suffered extreme loss of family and self-image at an early

The trial court specifically analyzed the relative culpability of codefendant Wooten, who received a life sentence, and found that the evidence indicated that the codefendant was an "underling of the defendant and was operating at the defendant's direction." Id. at 525-26.

Jackson appealed his convictions and sentence of death, raising seven claims.[3] This Court affirmed Jackson's convictions for first-degree murder and kidnapping and his death sentence for the murder. Id. at 536.

_____

age (given some weight); (2) Jackson suffered from a very abusive childhood, both from his family and while in foster care (given little weight); (3) Jackson suffered from serious mental health issues (bipolar disorder) and was involuntarily hospitalized in mental health hospitals for several years (given great weight); (4) Jackson has a special bond and is good with children (given little weight); (5) Jackson is capable of forming loving relationships with family members and friends and has the support of his family (given little weight); (6) Jackson has been a good and supportive son, brother, father, and husband (given little weight); (7) Jackson has biological children and a stepchild with whom he has bonded and who need his support and love (given little weight); (8) Jackson has worked and contributed to his family and society in his various jobs (given little weight); (9) Jackson had a good and close relationship with his neighbors (given little weight); (10) Jackson was a caring child and adult and tried to help people (given little weight); (11) Jackson demonstrated appropriate courtroom behavior throughout the course of the trial (given very little weight); and (12) Jackson can receive a life sentence and will die in prison (given little weight). Id. at 525 n.8.

3. On direct appeal, Jackson asserted that he was entitled to relief because: (1) the State engaged in improper impeachment, coupled with improper argument to the jury; (2) the trial court erred in allowing into evidence matters that were irrelevant and prejudicial; (3) the trial court erred in denying Jackson's request for an instruction regarding circumstantial evidence; (4) the trial court erred in denying Jackson's motion for judgment of acquittal on the ground that evidence failed to show that the victim died by the criminal agency of another; (5) the trial court erred in denying Jackson's requested jury instructions in the penalty phase; (6) the

- 7 -

Subsequently, Jackson filed a motion to vacate the judgment of conviction for first-degree murder and sentence of death, raising twenty-three claims.[4]  During

---

trial court imposed the death penalty upon an erroneous finding that CCP applied; and (7) Jackson's sentence of death was disproportionate.  Id. at 526 n.9.

4.  Specifically, Jackson's motion for postconviction relief alleged: (1) trial counsel was ineffective for failing to call Curtis Lewis during the guilt phase because Lewis would have testified that he saw the victim after the State alleged that she disappeared and had been killed; (2) trial counsel was ineffective for failing to question prospective jurors during voir dire in order to uncover those prospective jurors who were unable to give meaningful consideration to mitigating evidence; (3) trial counsel was ineffective for failing to object and request a Richardson inquiry, see Richardson v. State, 246 So. 2d 771 (Fla. 1971), or to move for a mistrial when witness Larry Paulk materially changed his testimony as to the last time that he had contact with the victim; (4) trial counsel was ineffective for failing to conduct a deposition or interview Larry Paulk, which would have alerted counsel that this witness had changed his testimony; (5) trial counsel was ineffective during the guilt phase for failing to object and move for severance of Jackson's case during Wooten's testimony, which prejudiced Jackson because Wooten testified to inadmissible evidence of other wrongs Jackson committed; (6) trial counsel was ineffective for presenting an unreasonable serial killer theory of defense during the trial proceedings; (7) trial counsel was ineffective for failing to request DNA testing or microscopic comparison of hairs found at the victim's shallow grave in order to exclude Jackson as the perpetrator; (8) trial counsel was ineffective for failing to object to hearsay testimony by the medical examiner and failing to object to improper bolstering by the medical examiner as to the work done by C.A. Pound Laboratory and Dr. Jan Westberry; (9) trial counsel was ineffective for failing to object or limit the opinion testimony of the medical examiner that the victim's death was a homicide; (10) trial counsel was ineffective for failing to consult with an expert, such as a forensic scientist, to assess the evidence and the crime scene investigation in Jackson's case; (11) trial counsel was ineffective for failing to adequately investigate the victim's background as to being an informant for the Metropolitan Bureau of Investigation (MBI) through publically available resources; (12) trial counsel was ineffective for failing to impeach hearsay testimony provided by witness Fred Hunt by calling Tonya Jackson and failing to use the transcripts of a video-recorded interview to impeach the testimony of V'Shawn Miles; (13) the prosecution violated Brady v. Maryland,

a Huff[5] hearing, the postconviction court summarily denied some of Jackson's claims and granted an evidentiary hearing in order for counsel to present evidence on claims 1, 3, 4, 6, 10, 11, and 17. After both parties presented their witnesses, the postconviction court denied all of the claims by written order. In addition, the court denied Jackson's motion for DNA testing.

## ANALYSIS

In this appeal, Jackson raises sixteen claims, contending that his trial counsel rendered ineffective assistance of counsel during the trial on numerous bases and

---

373 U.S. 83 (1963), and its progeny by not disclosing cell phone records to trial counsel belonging to Curtis Vreen's mother, which could have impeached the prosecution's time line; (14) trial counsel was ineffective for failing to object to several improper closing arguments by the State; (15) trial counsel was ineffective for failing to conduct an effective and coherent closing argument during the guilt phase; (16) the combination of cumulative errors in the guilt phase entitle Jackson to relief; (17) trial counsel was ineffective for failing to adequately investigate and present mitigating evidence of Jackson's prevalent substance abuse history and how it affected Jackson; (18) trial counsel was ineffective for agreeing to permit the trial court to take judicial notice of the date of release from the Florida Department of Corrections for the kidnapping count to prove that Jackson was a prison releasee reoffender; (19) trial counsel was ineffective for failing to present additional witnesses to support Jackson's community ties as a nonstatutory mitigator; (20) the combination of cumulative errors in the penalty phase entitle Jackson to relief; (21) the combination of cumulative errors in the guilt and penalty phases entitle Jackson to relief; (22) section 945.10, Florida Statutes, which prohibits Jackson from knowing the identify of his execution team, is unconstitutional; and (23) Jackson may be incompetent at the time of his execution. In addition, Jackson sought postconviction DNA testing of hairs that were found around the gravesite.

5. Huff v. State, 495 So. 2d 145 (Fla. 1986).

- 9 -

that the postconviction court erred in denying relief. He also challenges the postconviction court's denial of his motion for DNA testing. For the reasons more fully explained below, we reject each claim of error and deny relief.[6]

## I. Denial of Ineffective Assistance of Counsel Claims After Evidentiary Hearing

Jackson first asserts that the postconviction court erred in denying his ineffective assistance of counsel claims. Following the United States Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984), this Court has explained that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

---

6. We summarily deny Jackson's three cumulative error claims. Because Jackson has failed to show that any individual errors occurred, his cumulative error claims fail. See McCoy v. State, 113 So. 3d 701, 723 (Fla. 2013) ("When a defendant fails to prevail on any individual claim of ineffectiveness, a claim of cumulative error cannot succeed."). Accordingly, we deny claim 16 (involving alleged guilt-phase cumulative errors); claim 20 (involving alleged penalty-phase cumulative errors); and claim 21 (involving alleged cumulative errors occurring in the guilt and penalty phases). In addition, as Jackson recognizes that two of his claims are not ripe, we also deny claim 22 (pertaining to the constitutionality of section 945.10, Florida Statutes) and claim 23 (alleging that Jackson may be incompetent at the time of his execution).

- 10 -

Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).

To establish deficiency under Strickland, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." Morris v. State, 931 So. 2d 821, 828 (Fla. 2006) (quoting Strickland, 466 U.S. at 688). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. The defendant carries the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id.

As to the prejudice prong, the appropriate test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Both prongs of the Strickland test present mixed questions of law and fact. Sochor v. State, 883 So. 2d 766, 771-72 (Fla. 2004). In reviewing a trial court's ruling after an evidentiary hearing on an ineffective assistance of counsel claim,

"this Court defers to the factual findings of the trial court to the extent that they are supported by competent, substantial evidence, but reviews de novo the application of the law to those facts." Mungin v. State, 932 So. 2d 986, 998 (Fla. 2006).

We begin by addressing Jackson's four ineffective assistance of counsel claims that the postconviction court denied following an evidentiary hearing.

**A. Failure to Personally Investigate the Testimony of Curtis Lewis**

Jackson first asserts that the postconviction court erred in denying his claim that his defense counsel was ineffective for failing to personally investigate the statements of the victim's brother, Curtis Lewis, and present his testimony to the jury. Jackson contends that this testimony would have undermined the State's case by demonstrating that the victim was alive after November 9, 2004—the date that the State argued that Jackson had murdered her.

At trial, the date of the victim's disappearance was contested. Although the victim's cousin, Calvin Morris, testified that he saw Jackson kidnap the victim on November 9, 2004, after she had stolen drugs and money from Jackson, the victim's family did not report her missing until after Thanksgiving when she failed to attend a family gathering.

At the evidentiary hearing, Lewis testified that he thought he must have seen the victim on Sunday, November 14, 2004. Trial counsel Gerald Keating testified that he had relied on his defense investigator, who talked to Lewis prior to the trial,

and reported that Lewis related that he last saw the victim about three days before his birthday, which was a date prior to November 9, 2004, when the State alleged she disappeared.

The postconviction court found that trial counsel was not ineffective, noting that counsel had used the same defense investigator in the past and was very confident in him. The court further explained its reasoning as follows:

> This Court finds that it was reasonable for Mr. Keating to rely on a private investigator that he had great confidence in and he did not act deficiently in relying on what he was told by his investigator about Mr. Lewis.
>
> Also, the State had very persuasive evidence before the jury that the disappearance date of the victim, Ms. Paulk, was November 9, 2004, because of the traffic stop and arrest of Mr. Thomas which was clearly November 9, 2004, and that being the day that the victim was placed in the trunk of the car and last seen alive.
>
> This Court finds there was strong evidence in front of the jury that they could reasonably accept the November 9, 2004, date and that even if trial counsel was deficient in Claim 1, which this Court finds he was not, then the prejudice prong has not been shown.

After a full review, we hold that the record provides competent, substantial evidence to support the postconviction court's factual findings underpinning the conclusion that trial counsel was not deficient, and the postconviction court did not err in its conclusions of law.

At trial, after the exact date of the victim's disappearance was contested, defense counsel elicited testimony that some of the victim's family initially informed police that they had seen the victim well after November 9, 2004. The

victim's uncle, Larry Paulk, testified at the trial, stating that he did not know the date when the victim disappeared because she lived a very transient life. During cross-examination by the defense, Larry Paulk recognized that he had initially told the police that he thought he had last seen the victim around November 20, but on redirect, he explained that he talked to the police after her remains were found six months after he last saw her, and he had his dates confused. Fayonna Paulk, the victim's cousin, likewise testified about her difficulties in recalling exactly the last day she saw the victim alive. The jury was thus aware that members of the victim's family were struggling to recall the exact date they last saw the victim, particularly since the police did not question the family regarding the date of her disappearance until her body was found almost six months later.

At the postconviction evidentiary hearing, the evidence established that trial counsel Keating knew that various members of the victim's family, including Lewis, initially reported seeing the victim alive after her disappearance on November 9. Further, the testimony demonstrated that Keating requested his defense investigator to speak to these witnesses and show them a calendar. After the meetings, the defense investigator wrote a memo to Keating that provided the investigator's impressions as to the interviews and informed counsel that the witnesses were mistaken as to the dates. Keating testified at the evidentiary hearing that he would have called Lewis to testify at trial if he knew that Lewis

- 14 -

would have confirmed his initial statement that he had seen the victim after November 9, but that this was inconsistent with the investigator's report.

Thus, the record establishes that trial counsel did not fail to investigate this important evidence. To the contrary, defense counsel had investigated this lead, but based on statements that Lewis gave to the defense investigator, defense counsel decided not to call Lewis to testify. The fact that defense counsel's trusted investigator pursued the lead, rather than counsel personally, does not establish deficiency, as Jackson suggests. Accordingly, because counsel pursued this information and relied on the report of his investigator, the postconviction court did not err in finding that trial counsel was not deficient.

Moreover, Jackson has failed to demonstrate prejudice. At trial, the State called two of the victim's family members, Larry Paulk and Fayonna Paulk, both of whom initially told police that they had seen the victim after she had been kidnapped on November 9, but later realized their recollections of these dates were incorrect. Thus, the jury was aware of the difficulties that the victim's family experienced in recalling the date they last saw the victim because they were interviewed months after her disappearance.

Lewis's testimony at the evidentiary hearing likewise demonstrated that he too was struggling to piece together the date he last saw the victim. While he recalled that he saw the victim around his birthday, which was prior to the date of

the kidnapping on November 9, Lewis had to speculate as to which day he saw her, based on his usual work schedule and the fact that the park at which they last met was crowded. Further, Lewis did not dispute that he may have informed the defense investigator that he last saw the victim a few days after his birthday—a date that would have been before November 9, 2004.

In addition, there was compelling direct evidence at the trial showing that the actual kidnapping occurred on November 9, 2004. Specifically, Fred Hunt testified that on the same day that Jackson was looking for the victim after she stole from him, Hunt and a friend were pulled over by the police and given a ticket, establishing a link that the date of the kidnapping was November 9.

The equivocal testimony from Lewis presented at the evidentiary hearing does not undermine our confidence in the outcome of the guilt phase. Thus, even if Jackson could establish deficiency, he cannot establish prejudice. Accordingly, we affirm the denial of relief on this claim.

## B. Reliance on a Serial Killer Defense

Next, Jackson argues that the postconviction court erred in denying relief as to his claim that defense counsel was ineffective for relying on a serial killer defense and failing to retain an expert in criminal profiling. Specifically, Jackson claims that his counsel was ineffective for calling police officer, Captain Brian

Skipper, to testify and inquiring as to whether it was possible that the victim was killed by a serial killer who was in the area at the time.

After considering the evidence presented during the evidentiary hearing, the postconviction court denied the claim, finding that trial counsel made a reasonable, strategic choice in calling Captain Skipper and the benefit of presenting his testimony outweighed the potential danger. The court stated as follows:

> Mr. Keating had addressed during his testimony that he was trying to develop "grains of reasonable doubt in the jury" and this is a very common tactic used by criminal defense attorneys, particularly where there is a strong case for the State, to bring out any and all matters they feel might cause [s]ome reasonable doubt, either sufficient to get a not guilty verdict or a lesser included offense or even convince one juror out of twelve which can result in a hung jury. This Court finds that tactic to be reasonable and it was not a deficiency on the part of the trial counsel.
> As previously noted, as to this Claim, there was some similarity to the killing of the victim in this case and some of the victims of the serial killer. The victims of the serial killer were drug users, some were drug dealers, and some were either known prostitutes or thought to be prostitutes, and at least two of the bodies of the women were found in the same general area of where the victim's body [was] found and it was close in time, approximately a year to a year and a half difference.
> . . . .
> Finally, as to the second part of [this claim], that failing to consult with experts regarding such a Claim, this Court finds that experts regarding crime scene reconstruction, interpretation, either it being at the apartment, the automobile, or the gravesite, since almost six months had passed from the time of the victim's disappearance to when the dog walker discovered her skeletal remains when his dog started scratching the ground, but experts would not have been helpful and the fact the trial counsel did not hire any crime scene reconstruction or interpretation experts was not unreasonable.

- 17 -

We affirm this ruling because the record provides competent, substantial evidence to support the postconviction court's factual findings that trial counsel was not deficient, and the postconviction court did not err in its conclusions of law.

At the postconviction evidentiary hearing, Jackson presented the testimony of Brent Turvey, a forensic scientist and criminologist. Turvey recognized that a serial killer was in the area around the time that the victim was killed and that the serial killer would rape prostitutes who were addicted to drugs and then shoot them in the head. Turvey, however, disagreed with defense counsel's decision to present such a defense theory to the jury because Turvey thought the victim's murder in this case seemed to be different from those in the serial killer case. Turvey also found other problems with the police's investigation into the victim's death, including that the case did not seem to have a lead investigator at the time the crime scene was analyzed and that the police assumed Jackson was the killer.

Defense counsel Keating testified at the evidentiary hearing that he chose to present the serial killer defense as a possible explanation for Pallis's death because she shared similarities with the victims in the serial killer case and her body was found in a similar location as the serial killer's victims. In deciding to call Captain Skipper, Keating knew that Captain Skipper would not provide solely favorable testimony, but called him because Captain Skipper was the only witness who could testify as to the serial killer evidence.

As this Court has long held, "[c]ounsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions. . . . [S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000). Jackson bears the burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " McCoy, 113 So. 3d at 707 (quoting Michel, 350 U.S. at 101). "There is a strong presumption that trial counsel's performance was not ineffective." Id. at 707-08.

Here, Jackson was seen by numerous witnesses kidnapping the victim after she stole money and drugs from him, and the victim was never seen alive after this time. When her body was eventually discovered, the body was so decomposed that it provided little evidence as to how and when she died. In light of these unique circumstances, defense counsel chose to present evidence that Pallis lived a very risky lifestyle in an area where a serial killer was murdering victims similar to Pallis and whose bodies were found in close proximity to Pallis's. The serial killer evidence could have planted seeds of doubt in the jury's mind. Jackson has not shown that his counsel was deficient in presenting an additional suspect for the murder. Thus, we reject this claim.

## C. Failure to Find Other Suspects Who May Have Committed the Murder

Jackson next asserts that trial counsel was ineffective for failing to find online newspaper articles documenting the investigation of the Metropolitan Bureau of Investigation (MBI), which was a collection of police agencies that worked together to target organized prostitution and drug rings, including at Cleo's, the club where the victim worked. During the MBI's investigation, the victim was charged with one count of sale or delivery of cocaine, a charge that was dismissed on June 25, 2002. Other performers at Cleo's also were investigated and charged with crimes. William Hinton wrote two articles published online concerning this investigation, in which he discussed how the victim had initially made allegations against the manager of Cleo's, but later recanted. The investigation and charges against Cleo's were completed by January 2003, after Cleo's agreed to pay the cost of the investigation and civil penalties.

During the postconviction proceedings, defense counsel Keating was asked about the failure to discover the internet articles pertaining to the MBI investigation and his failure to present a retaliation theory to the jury that Cleo's managers may have been behind the murder in this case. After the evidentiary hearing concluded, the postconviction court denied this claim, finding that trial counsel was not deficient in failing to discover the information and that even if counsel had been deficient, Jackson could not establish prejudice because the

victim "did not turn up missing until November of 2004, almost two years [after the MBI investigation concluded]. This Court finds that it certainly would seem to be unreasonable for a trial counsel to try to argue that something that happened more than two years ago would still have resulted in [the victim's] death because of that . . . activity."

We affirm the postconviction court's denial of relief on this claim. While testimony from the postconviction evidentiary hearing clearly shows that defense counsel did not discover the internet articles regarding the MBI investigation, Jackson failed to show that his counsel was deficient based on his failure to uncover this information that occurred more than two years before the murder. The entire record in this case demonstrates that counsel performed a reasonable investigation. Counsel cannot be deemed deficient merely because he did not discover the online articles that were uncovered as part of the extensive additional discovery conducted during Jackson's postconviction proceedings.

Moreover, even if this Court found that defense counsel was deficient in failing to discover online articles regarding the MBI investigation, Jackson must demonstrate prejudice—that the error, if any, undermines confidence in the outcome. Here, while counsel could have presented additional evidence that a person from Cleo's may have had a motive to kill the victim, there were significant problems with this MBI investigation theory, including: (1) the investigation

against Cleo's had begun almost three years earlier and concluded twenty-two months prior to the victim's death; (2) numerous other performers were also being investigated and provided statements to the investigators; (3) the victim continued to work at Cleo's after the investigation ended; and (4) Cleo's was located over sixty miles away from where the victim was killed. Had the jury been presented with this theory, based on these inherent problems, this theory would have had little chance of success and may have been a risky theory to present at all. The failure to present this theory does not undermine our confidence in the outcome.

### D. Failure to Present Drug Addiction Evidence During Penalty Phase

In this claim, Jackson asserts that his counsel was ineffective for failing to focus on Jackson's drug addictions during the penalty phase. At the evidentiary hearing, Jackson called witnesses who testified that Jackson smoked marijuana constantly, would drink brandy, and took ecstasy pills. In addition, he presented the testimony of Dr. Daniel Buffington, an expert in pharmacology and toxicology, who testified about Jackson's exposure to drugs, including in utero, and how this drug use would impact his thought processes. The postconviction court denied this claim, finding that the failure to present Jackson's drug history was a tactical decision in which counsel chose instead to place the emphasis on Jackson's mental health issues and his difficult childhood.

We affirm, concluding that the postconviction court's factual findings are supported by competent, substantial evidence and that the court did not err as to its legal conclusions. Trial counsel testified at the postconviction evidentiary hearing that counsel knew Jackson abused drugs and tried to convey to the jury how troubled Jackson's life was from the beginning, including that his mother had used PCP when she was pregnant; that Jackson grew up with a mother who was heavily addicted to drugs; that Jackson tried to commit suicide at age eight; that he lived for two years at a psychiatric hospital; that when Jackson stayed with his mother, he was beaten until the State finally removed him; and that he later lived in group homes. While defense counsel presented evidence regarding his mother's in utero drug usage to the jury, counsel did not present Jackson's personal drug usage because Jackson denied using heavy drugs and counsel did not believe that evidence concerning the use of marijuana would be an effective mitigator in the eyes of the jury.

We conclude that defense counsel made a reasonable, strategic decision to not argue that Jackson's addiction to marijuana was a reason not to impose the death penalty. "Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions." Occhicone, 768 So. 2d at 1048. The record shows that this was a strategic decision and that alternative courses for the penalty phase were considered and rejected. Moreover, "strategic

decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct." Id. Based on this record, Jackson has failed to overcome the "strong presumption that trial counsel's performance was not ineffective." McCoy, 113 So. 3d at 707-08.

Thus, he is not entitled to relief on this claim. We next turn to seven ineffective assistance of counsel claims that the postconviction court summarily denied without an evidentiary hearing.

## II. Summary Denial of Ineffective Assistance of Counsel Claims

The postconviction court also summarily denied several of Jackson's ineffective assistance of counsel claims, finding that no evidentiary hearing was required as to those claims. As this Court has held, a defendant is "normally entitled to an evidentiary hearing on a postconviction motion 'unless (1) the motion, files, and records in the case conclusively show that the movant is entitled to no relief, or (2) the motion or particular claim is legally insufficient.' " Valentine v. State, 98 So. 3d 44, 54 (Fla. 2012) (quoting Franqui v. State, 59 So. 3d 82, 95 (Fla. 2011)). However, conclusory allegations are not sufficient—the defendant bears the burden of "establishing 'a prima facie case based on a legally valid claim.' " Id. (quoting Franqui, 59 So. 3d at 96). "[T]o the extent there is any question as to whether a rule 3.851 movant has made a facially sufficient claim

requiring a factual determination, the Court will presume that an evidentiary hearing is required." Walker v. State, 88 So. 3d 128, 135 (Fla. 2012). We now address each of these summarily denied claims.

## A. Failure to Object to Several Prosecutorial Closing Arguments

In this claim, Jackson asserts that the postconviction court erred in summarily denying his claim that his trial counsel was ineffective for failing to object to numerous prosecutorial closing arguments. Jackson first contends that his counsel was ineffective for failing to object to closing arguments in which the State recalled the evidence that the victim did not initially seem to object or ask for help during the kidnapping, but later fought against being shoved into the truck of the car. In a similar vein, Jackson challenges defense counsel's failure to object to closing comments about the victim's four-year-old daughter, alleging that this statement served only to evoke sympathy toward the victim.

This Court has held that the State is entitled to make comments recounting a victim's last hours alive if the comments are supported by the evidence, but the State cannot create an imaginary first-person script depicting the victim's suffering or death or invite jurors to place themselves in the position of the victim. See Rogers v. State, 957 So. 2d 538, 549 (Fla. 2007) (holding that the State's comments were proper when the State described the pain that the victim must have felt when she was stabbed and pointed out that she was alive and conscious for an

- 25 -

additional ten to twenty minutes and had the opportunity to reflect on her life and the opportunities she would no longer be able to act upon or that she would never see her children again because the comments were based upon facts in evidence and were not golden rule arguments).

We affirm the postconviction court's denial of relief as to this portion of the closing arguments claim. When the closing arguments are viewed in context, the State was addressing the mental process experienced by the victim when she initially did not attempt to escape or plead for her life at the point that she was bound in the bathtub, but realized her impending death when she was carried from the apartment and shoved into the trunk of a car. Witnesses testified how at that point, she began to struggle and fight for her life, pleading with Jackson not to put her in the trunk and apologizing to him. These arguments were not improper because they were based upon facts in evidence. In the context of this case, the State was simply discussing how the evidence showed that the victim realized her impending death as she was being forced into the trunk.

In addition, Jackson contends that trial counsel was ineffective for failing to object to improper vouching from the State when it argued that some of the witnesses had the courage to testify in court and reminded the jury about the testimony concerning threats against some of the witnesses. This Court has held that "improper vouching or bolstering occurs when the State 'places the prestige of

- 26 -

the government behind the witness or <u>indicates that information not presented to the jury supports the witness's testimony</u>.' " <u>Wade v. State</u>, 41 So. 3d 857, 869 (Fla. 2010) (emphasis added) (quoting <u>Williamson v. State</u>, 994 So. 2d 1000, 1013 (Fla. 2008)).

Here, the State was addressing the decisions of the witnesses to testify in light of the fact that some of the witnesses had been threatened. Testimony at trial supported that Jackson had threatened Hunt before he went to the police, which motivated Hunt to seek help from the police, and codefendant Wooten made threats in the courtroom during the trial itself. The comments at issue pertained to threats that were facts in evidence before the jury. The State addressed the threats when discussing the witnesses' delay in approaching the police months after the crime, but did not state that the threats were believable—reminding the jury to consider the testimony before them when weighing the credibility of the witnesses.

This Court has previously denied a similar claim where a defendant asserted that the State impermissibly vouched for a witness's credibility by reminding the jury that, although the witness had provided a different version of his story, the witness had been threatened and was afraid for his own safety. <u>See</u> <u>Williamson</u>, 994 So. 2d at 1012-13. When viewed in context, these comments were not improper vouching; the State was discussing evidence before the jury and asking

the jury to consider the evidence before it when weighing the credibility of the witnesses.

Next, Jackson contends that his counsel was ineffective for failing to object to the State's rebuttal closing comments after defense counsel attacked the credibility of the State's witnesses. Specifically, the State in its rebuttal implicitly rebuked the defense's closing arguments, stating that challenges to the State's witnesses were "easy pickings" and agreeing with defense counsel that its own witnesses had significant credibility issues based on the fact that most of the witnesses were involved in illegal activities. We reject this claim because we conclude that these comments were made in rebuttal to Jackson's closing arguments and were a fair response to defense counsel's attack on the credibility of the State's witnesses.

Finally, Jackson contends that his counsel was ineffective for failing to object to the State's argument that the serial killer defense was "grasping [at] straws," asserting that the State denigrated the role of defense counsel and the theory of the defense. As the Fifth District Court of Appeal has held, "[a] prosecutor may not ridicule a defendant or his theory of defense." Servis v. State, 855 So. 2d 1190, 1194 (Fla. 5th DCA 2003). In Servis, the Fifth District concluded that it was improper for the prosecutor to make comments that defense counsel was "doing all they can to throw whatever they can against the wall and

see what sticks." Id. at 1193. We caution the prosecution against making comments that ridicule a defendant for presenting a defense. However, in looking to all of the arguments in this case, the State's comment was relatively minor and brief. The failure to object to such a comment did not "so affect the fairness and reliability of the proceeding that confidence in the outcome is undermined." Braddy v. State, 111 So. 3d 810, 850 (Fla. 2012) (quoting Davis v. State, 928 So. 2d 1089, 1122 (Fla. 2005)), cert. denied, 134 S. Ct. 275 (2013).

Accordingly, for the reasons explained above, Jackson is not entitled to relief on this claim.

### B. Failure to Conduct an Effective, Competent Closing Argument

Jackson next asserts that the postconviction court erred in summarily denying relief pertaining to his claim that trial counsel was ineffective for failing to conduct an effective, competent closing argument. The postconviction court denied this claim, succinctly stating that "[t]he trial record stands on its own in reference to that. This Court finds that the closing arguments by the defense counsel [were] logical, coherent, and trial counsel was not deficient in its closing arguments."

We agree. Defense counsel's closing arguments were by no means cursory. Based on the evidence presented by numerous witnesses that Jackson had kidnapped the victim after she stole from him, trial counsel argued that Jackson

- 29 -

had simply intended to scare the victim and had released her. Defense counsel's closing arguments focused on whether the State left too many questions unanswered and its failure to present any evidence as to how or when the victim died. Defense counsel stressed that the victim lived a very risky lifestyle, that numerous people could have caused her death, and that most of the witnesses who testified for the State were co-conspirators to the kidnapping, who were attempting to curry favor with the State. In fact, defense counsel discussed each witness individually, identified the holes in each witness's testimony and the inconsistencies with their prior statements, and elaborated on their motives in testifying. Accordingly, we hold that the postconviction court did not err in concluding that defense counsel was not deficient in the presentation of closing arguments.

### C. Failure to Effectively Question the Jury Venire

As his next claim, Jackson contends that his trial counsel was ineffective for failing to "effectively" question the jury venire about how they would weigh nonstatutory mitigators. The postconviction court summarily denied this claim.

We affirm. In order to be entitled to relief, Jackson must identify "particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Schoenwetter, 46 So. 3d at 546 (quoting Maxwell, 490 So. 2d at 932). Defense

counsel questioned the prospective jurors extensively about their opinions on the death penalty, their ability to follow the law, their ability to consider mitigators in general, and their opinions on mercy. The record shows that trial counsel focused extensively on obtaining a jury that could consider and weigh mitigation in determining the appropriate penalty. Jackson has not identified any particular omissions of defense counsel outside the broad range of reasonably competent performance simply because counsel did not ask additional, more specific questions pertaining to each of the unlimited number of mitigators that counsel could seek to present. Thus, we deny this claim.

### D. Failure to Move for a Severance When Codefendant Wooten Testified About Evidence of Other Crimes

In this claim, Jackson argues that his trial counsel was ineffective for failing to object and move for a severance at the point in Jackson's case when codefendant Wooten testified in his own defense, but discussed evidence of other crimes pertaining to the retrieval of guns after one of Jackson's family members had been previously killed. In addition, Jackson asserts that counsel should have argued for a motion to sever based on a controlled call between Fred Hunt and codefendant Wooten, which would not have been introduced at all if the cases were severed.

The record shows that trial counsel objected to the initial motion to consolidate Wooten's and Jackson's trials. Further, trial counsel later unsuccessfully moved to sever the defendants' trials. While Jackson recognizes

this, he contends that his counsel was ineffective in any event because he did not move for a severance at an additional point in time.

During the trial itself, the State called Hunt, who went with friends to the police station months after the crime to report what they knew. Hunt was subsequently arrested for kidnapping, and while in custody, agreed to call codefendant Wooten to talk about the kidnapping and murder while the police recorded the conversation. At trial, Hunt testified as to the contents of his recorded conversation with Wooten, in which Wooten made certain incriminating statements.

After the State rested, Wooten chose to testify in his own defense and attempted to explain this conversation. According to Wooten, the day before the recorded phone call, Hunt called Wooten and they had a conversation regarding Jackson's cousin being killed and Jackson's desire to find out who killed his cousin. A friend of theirs retrieved some guns and placed them in a car. Wooten told Jackson to let the matter go, and Jackson agreed. According to Wooten's trial testimony, when he talked to Hunt on the day of the recorded phone call, Wooten asserted that he thought Hunt was talking about that incident and his statements on the phone had nothing to do with the victim's disappearance.

Jackson's trial counsel did not object to Wooten's testimony concerning a friend of Jackson's retrieving the guns. However, very shortly after this testimony

was presented, Jackson's trial counsel again moved for a severance, which the trial court denied.

We conclude that counsel was not deficient for failing to move for a severance at the time codefendant Wooten testified about the guns. Wooten did not testify that Jackson directed the guns be placed in any car, but actually asserted that Jackson agreed to leave the matter concerning his cousin alone. In addition, the record shows that trial counsel repeatedly filed motions for severance. Counsel is not deficient simply because the motions were denied. Accordingly, we affirm the postconviction court's denial of relief on this claim.

### E. Failure to Seek Testing for Hairs Found at the Crime Scene

Jackson also contends that his trial counsel was ineffective for failing to seek DNA testing or microscopic comparison of hairs found at the crime scene, which could have excluded Jackson or could have potentially incriminated another individual. The postconviction court summarily denied this claim.

To be entitled to relief, Jackson must identify "particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards." Schoenwetter, 46 So. 3d at 546 (quoting Maxwell, 490 So. 2d at 932). Again, this alleged failure does not meet this standard. Identifying the donor of hairs found at an outdoor crime scene over six months after the death would not have established that the hairs

definitively belonged to the murderer. Anyone could have visited the location where the victim was found. Moreover, testing the DNA of the hairs may have resulted in determining that they belonged to a person who was investigating the crime scene. However, the presence of the unidentified hairs provided an opportunity for counsel to plant seeds of reasonable doubt that the hairs may have belonged to another person who had committed the murder. Thus, the postconviction court did not err in summarily denying this claim.

**F. Failure to Impeach Hearsay Testimony by Hunt Pertaining to Threats**

Jackson next contends that his trial counsel was ineffective during the guilt phase because counsel failed to impeach two witnesses: (1) Fred Hunt regarding Hunt's testimony that he was told Jackson threatened to kill him; and (2) V'Shawn Miles regarding the defendant's lack of knowledge of the murder.

Specifically, in his motion for postconviction relief, Jackson alleged that trial counsel was ineffective for failing to impeach Hunt's testimony that Tonya Jackson told Hunt that Jackson had threatened to kill Hunt. Jackson contended that trial counsel should have called Tonya Jackson in rebuttal "to refute that she ever told Mr. Hunt that Mr. Jackson threatened to kill him." At the Huff hearing, Jackson again reiterated that he requested an evidentiary hearing on this claim, stating that he could present testimony from Tonya Jackson that she never told Hunt that Jackson had threatened to kill him. This evidence was relevant because

Hunt claimed he was afraid of Jackson and approached the police regarding the crime only after Tonya Jackson informed him that Jackson threatened to kill him. The postconviction court summarily denied this claim because Jackson "failed to make an argument and showing what those persons would say and how it would have been effective."

We conclude that the postconviction court erred in summarily denying this claim. Here, Jackson made specific allegations that his counsel was ineffective for failing to call Tonya Jackson to rebut a statement that Hunt asserted she made. Further, in both the postconviction motion and at the Huff hearing, Jackson asserted that Tonya Jackson would refute that she made that statement to Hunt. Thus, since Jackson sought to introduce Tonya Jackson's testimony that she never stated to Hunt that Jackson threatened to kill Hunt, the postconviction court erred in failing to grant an evidentiary hearing on this claim. Moreover, Tonya Jackson was present at the evidentiary hearing and was questioned as to her ex-husband's drug usage. Questioning her as to whether she made a statement to Hunt would not have required much additional time during the hearing and would have put this issue to rest.

However, even taking all of Jackson's factual allegations relating to this claim as true, we conclude that he is not entitled to relief. After the victim stole Jackson's money and drugs, Jackson called numerous people looking for the

victim.  A significant number of witnesses testified that they saw Jackson kidnap the victim at gunpoint or that they saw the victim bound in a bathtub with Jackson guarding her.  Jackson showed Latisha Allen a woman bound in a bathtub and told Allen that he had been robbed.  When Allen asked if Jackson would kill her, he nodded.  Numerous witnesses testified that once night fell, Jackson posted lookouts and then carried the victim to a car, shoved her in a trunk, and when she fought against being placed into the trunk, she was punched in the face until they could close the lid.  After the victim disappeared, Jackson made several incriminating remarks, including telling multiple people that without a body, the State did not have a case.  In addition, when one of Jackson's friends told Jackson that a body had been found, Jackson called another person on the phone and asked that person to go to the "spizzot" but "step lightly" and then call him back.  The challenged testimony at issue—whether Tonya Jackson told Hunt that Jackson threatened to kill Hunt—was relevant only to rebut the defense's suggestion that Hunt had another motive to testify.  However, Hunt's story was supported by Latisha Allen, who testified as to most of the same events.

Accordingly, although the postconviction court erred in not granting an evidentiary hearing, accepting all of the factual allegations as true, our confidence in the outcome is not undermined.  Thus, we deny relief as to this portion of the claim.  Nevertheless, we take this opportunity to remind trial courts of the critical

importance of evidentiary hearings in death penalty cases on issues that require factual development.

The second portion of this claim involves whether counsel was ineffective for failing to impeach V'Shawn Miles with a transcript of her initial police interview. Specifically, Miles testified at trial that she knew Jackson and asked him directly whether he had killed the victim. He responded, "No body, no case." She then asked whether the victim had robbed him, to which he responded that people "shouldn't fuck with people['s] things." On cross-examination, defense counsel attempted to impeach Miles by asking her whether, when she initially talked to the police, she had "also said that [Jackson] said 'I don't know what happened to her.' " Miles denied it, stating, "I don't recall saying that." Defense counsel did not impeach Miles by using the transcripts from her police interview.

We affirm the summary denial of relief as to this portion of the claim. Whether Miles initially said that Jackson also made this statement does not impact the "no body, no case" statements to which she testified at trial. Miles's testimony about this conversation shows that Jackson was not actually admitting to anything, but some of his comments were not denying his involvement. In fact, other witnesses also testified that Jackson made similar statements to them.

Accordingly, Jackson is not entitled to relief on either of the portions of this claim.

**G. Failure to Make the State Meet Its Burden to Prove PRR Status**

In his final ineffective assistance of counsel claim, Jackson argues that the postconviction court erred in summarily denying his claim that trial counsel was ineffective when counsel permitted the court to take judicial notice of certified and signed copies of documents that recognized Jackson's date of release from the Florida Department of Corrections, which was used to establish that Jackson qualified as a prison releasee reoffender (PRR).

Even in his challenge to the postconviction court's summary denial of this claim, Jackson fails to assert why his counsel was deficient or allege how he could have been prejudiced by the fact that Jackson's PRR status was established through taking judicial notice of the documents, instead of presenting witnesses to establish this same fact. He does not contend that the State would have been unable to prove PRR status without the court taking judicial notice of the documents. Thus, we deny relief on this claim.

### III.  Denial of DNA Testing

In his last claim on appeal, Jackson asserts that the postconviction court erred in denying his motion for postconviction DNA testing. Specifically, while a defendant has the right to request DNA testing, in order to be entitled to testing, the petition must include the following:

> (1)  a statement of the facts relied upon in support of the motion, including a description of the physical evidence containing

DNA to be tested and, if known, the present location or last known location of the evidence and how it originally was obtained;

(2) a statement that the evidence was not previously tested for DNA, or a statement that the results of previous DNA testing were inconclusive and that subsequent scientific developments in DNA testing techniques likely would produce a definitive result establishing that the movant is not the person who committed the crime;

(3) a statement that the movant is innocent and how the DNA testing requested by the motion will exonerate the movant of the crime for which the movant was sentenced, or a statement how the DNA testing will mitigate the sentence received by the movant for that crime;

(4) a statement that identification of the movant is a genuinely disputed issue in the case and why it is an issue or an explanation of how the DNA evidence would either exonerate the defendant or mitigate the sentence that the movant received;

(5) a statement of any other facts relevant to the motion; and

(6) a certificate that a copy of the motion has been served on the prosecuting authority.

Fla. R. Crim. P. 3.853(b). This Court has explained that "[i]t is the defendant's burden to explain, with reference to specific facts about the crime and the items requested to be tested, how the DNA testing will exonerate the defendant of the crime or will mitigate the defendant's sentence." Lott v. State, 931 So. 2d 807, 820 (Fla. 2006) (quoting Robinson v. State, 865 So. 2d 1259, 1265 (Fla. 2004)).

The postconviction court denied the motion for DNA testing of hairs from the crime scene, holding that Jackson had not met his burden because he failed to show that "there may be DNA which would exonerate him or mitigat[e] his sentence." The postconviction court explained that the hair issues were a very minor aspect of the State's case because they were found at the gravesite, an

- 39 -

outdoor public area, six months after the victim went missing. Moreover, numerous law enforcement officers were in the vicinity, as were the medical examiner's personnel. Thus, the court concluded that the hairs could have come from many sources. In addition, the court reviewed how the facts in Jackson's case were affected by his allegations pertaining to the hairs, noting that in this case, Jackson was seen kidnapping the victim, indicating that he was going to kill the victim before she disappeared, and then uttering statements after the body was found in which he did not deny that he killed the victim.

We affirm the postconviction court's denial of Jackson's motion for DNA testing, as we have previously affirmed the denial of relief in similar situations. For example, in Lott, this Court affirmed the denial of relief where a defendant sought DNA testing of hairs found in the victim's shower drain and on a bed pillow because the defendant failed to present any reason to suspect that the hairs were connected to the murder, and not simply hairs left behind by normal guests, and he did not show "a reasonable probability that [he] would have been acquitted or would have received a lesser sentence" if they had been tested. Lott, 931 So. 2d at 821 (quoting Fla. R. Crim. P. 3.853(c)(5)(C)). Thus, this Court concluded that Lott was engaging in a fishing expedition based on pure conjecture. See also Overton v. State, 976 So. 2d 536, 568 (Fla. 2007) (affirming the denial of a request for DNA testing of hairs because "evidence that the hairs came from someone

other than Overton or the victims would fail to prove or disprove any theory in this case because it is impossible to establish when or how the hairs may have become attached to the tape" and thus the hairs did not necessarily belong to the person who committed the murder).  For similar reasons, we affirm the postconviction court's denial of this claim.

## CONCLUSION

For the reasons addressed above, we affirm the postconviction court's denial of relief.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.


An Appeal from the Circuit Court in and for Volusia County,
      R. Michael Hutcheson, Judge - Case No. 2005-32590 CFAES

Raheela Ahmed and Maria Christine Perinetti, Assistant Capital Collateral Regional Counsels, Middle Region, Tampa, Florida,

      for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, Florida,

      for Appellee